No. 23-30294

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

PLAQUEMINES PARISH,

*Plaintiff-Appellee*,

LOUISIANA STATE; LOUISIANA DEPARTMENT OF NATURAL
RESOURCES, OFFICE OF COASTAL MANAGEMENT, THOMAS F.
HARRIS, SECRETARY,

*Intervenors-Appellees*,

v.

BP AMERICA PRODUCTION COMPANY, as successor in interest to AMOCO
PRODUCTION COMPANY; BURLINGTON RESOURCES OIL & GAS
COMPANY, L.P.; CHEVRON USA, INCORPORATED, as successor in interest
to CHEVRON OIL COMPANY, THE CALIFORNIA COMPANY, AND GULF
OIL CORPORATION; EXXON MOBIL CORPORATION, as successor in
interest to THE SUPERIOR OIL COMPANY; SHELL OFFSHORE,
INCORPORATED; SHELL OIL COMPANY; CHEVRON U.S.A. HOLDINGS,
INCORPORATED, as successor in interest to TEXACO E&P INCORPORATED.
AND TEXACO INCORPORATED; TEXAS COMPANY; CHEVRON PIPE
LINE COMPANY, as successor in interest to GULF REFINING COMPANY,

*Defendants-Appellants*.

On Appeal from the United States District Court for the
Eastern District of Louisiana, No. 2:18-cv-05256 (Hon. Jay C. Zainey)

**BRIEF FOR THE CHAMBER OF COMMERCE OF THE
UNITED STATES OF AMERICA AND THE NATIONAL ASSOCIATION
OF MANUFACTURERS AS *AMICI CURIAE* IN SUPPORT OF
DEFENDANTS-APPELLANTS AND REVERSAL**

Andrew Kim
William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
*andrewkim@goodwinlaw.com*

*Counsel for Amici Curiae*

*(Additional Counsel Listed on Inside Cover)*

Andrew R. Varcoe
Jonathan D. Urick
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062
(202) 463-5337

*Counsel for the Chamber of Commerce
for the United States of America*

Michael A. Tilghman II
NATIONAL ASSOCIATION OF
MANUFACTURERS
733 10th Street, NW, Suite 700
Washington, DC 20001
(202) 637-3100

*Counsel for the National
Association of Manufacturers*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the Chamber of Commerce of the United States of America ("Chamber") certifies that it does not have a parent corporation and that no publicly held company has 10% or greater ownership in the Chamber.

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the National Association of Manufacturers ("NAM") certifies that it does not have a parent corporation and that no publicly held company has 10% or greater ownership in the NAM.

*/s/ Andrew Kim*
Andrew Kim
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
andrewkim@goodwinlaw.com

*Counsel for Amici Curiae*

i

## CERTIFICATE OF INTERESTED PERSONS

Pursuant to Fifth Circuit Rules 26.1, 28.2.1, and 29.2, the undersigned counsel of record certifies that, in addition to those already listed in Defendant's Opening Brief, the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made so that the judges of this Court may evaluate possible disqualification or recusal.

*/s/ Andrew Kim*
Andrew Kim
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
(202) 346-4000
andrewkim@goodwinlaw.com

*Counsel for Amici Curiae*

Amici Curiae:

The Chamber of Commerce of the United States of America

The National Association of Manufacturers

Counsel for *Amici Curiae:*

Andrew Kim and William M. Jay of Goodwin Procter LLP, on behalf of *amici curiae* the United States Chamber of Commerce and the National Association of Manufacturers

Jonathan D. Urick and Andrew R. Varcoe of the U.S. Chamber Litigation Center, on behalf of *amicus curiae* the United States Chamber of Commerce

Michael A. Tilghman II of the NAM Legal Center, on behalf of *amicus curiae* the National Association of Manufacturers

# TABLE OF CONTENTS

**Page**

INTEREST OF THE *AMICI CURIAE* ...................................................1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .............................2

ARGUMENT ...........................................................................5

I.  The district court's overly narrow reading of the "acting under" requirement for federal officer removal contravenes binding precedent, which requires only a relationship in which the removing private defendant assists a federal agency or officer's performance of governmental functions. ..............................................5

II.  The district court's narrow construction of "acting under" will create forum uncertainty that will discourage private companies from providing assistance to the federal government. .........................................12

III.  Much like the rest of the petroleum industry, The Texas Company and the Gulf Oil Company "acted under" federal officers during the Second World War by producing refined petroleum products to fulfill contracts with the federal government. .......................................15

CONCLUSION ........................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Bartel v. Alcoa S.S. Co.*,
  805 F.3d 169 (5th Cir. 2015) .............................................................10

*Bradford v. Harding*,
  284 F.2d 307 (2d Cir. 1960) .............................................................13

*Caver v. Cent. Ala. Elec. Co-op.*,
  845 F.3d 1135 (11th Cir. 2017) .........................................................10

*In re Commonwealth's Motion to Appoint Counsel Against or
  Directed to Defender Ass'n of Phila.*,
  790 F.3d 457 (3d Cir. 2015) .............................................................11

*Exxon Mobil Corp. v. United States*,
  108 F. Supp. 3d 486 (S.D. Tex. 2015).........................................18, 20

*Exxon Mobil Corp. v. United States*,
  Nos. 10-2386, 11-1814, 2020 WL 5573048
  (S.D. Tex. Sept. 16, 2020) .................................................................17

*Genereux v. Am. Beryllia Corp.*,
  577 F.3d 350 (1st Cir. 2009)...........................................................9, 23

*Isaacson v. Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008) .............................................................14

*Latiolais v. Huntington Ingalls, Inc.*,
  951 F.3d 286 (5th Cir. 2020) (en banc) .............................7, 8, 10, 11

*Louisiana v. Sparks*,
  978 F.2d 226 (5th Cir. 1992) .............................................................13

*Papp v. Fore-Kast Sales Co.*,
  842 F.3d 805 (3d Cir. 2016) ...............................................................9

*Plaquemines Parish v. Chevron USA, Inc.*,
  No. 22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022)...........4, 8, 19, 22, 23

iv

*Port of Corpus Christi Auth. of Nueces Cnty. v.*
  *Port of Corpus Christi L.P.*,
  57 F.4th 432 (5th Cir. 2023) ....................................................5

*Shell Oil Co. v. United States*,
  751 F.3d 1282 (Fed. Cir. 2014) ..............................................17, 19

*St. Charles Surgical Hosp. LLC v. La. Health Serv. & Indem. Co.*,
  990 F.3d 447 (5th Cir. 2021) ..................................................3, 6

*Tennessee v. Davis*,
  100 U.S. 257 (1879)..............................................................13

*Texas v. Kleinert*,
  855 F.3d 305 (5th Cir. 2017) ...................................................5

*Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*,
  No. 22-10414, 2023 WL 2573914 (5th Cir. Mar. 20, 2023) ..................8, 21, 22

*Watson v. Philip Morris Cos.*,
  551 U.S. 142 (2007)............................................ 3, 6, 7, 12, 13, 20, 22

*Williams v. Lockheed Martin Corp.*,
  990 F.3d 852 (5th Cir. 2021) ...................................................5

*Willingham v. Morgan*,
  395 U.S. 402 (1969)..............................................................12

*Winters v. Diamond Shamrock Chem. Co.*,
  149 F.3d 387 (5th Cir. 1998) ...................................................14

**Statutes and Regulations**

28 U.S.C. § 1442(a) ........................................... 2, 3, 5, 7, 9, 10, 13, 14, 15

**Other Authorities**

Erik J. Dahl, *Naval Innovation:  From Coal to Oil*,
  Joint Force Quarterly 51 (Winter 2000-2001)....................................16

Exec. Order No. 9,276,
  7 Fed. Reg. 10,091 (Dec. 4, 1942)..............................................17

John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War* 1941-1945 (U.S. Gov't Printing Office 1946) ....................................................16, 17, 18, 23

*Hearings Before H. Comm. on Naval Affairs on Estimates Submitted by the Secretary of the Navy,* 63d Cong. 761 (1915).........................................16

Stanley I. Kutler, *Judicial Power and Reconstruction Politics* (1968) ...................13

Nat'l Petroleum Council, *A National Oil Policy for the United States* (1949)...........................................16

Statement of Senator Joseph C. O'Mahoney, Chairman, Special Committee to Investigate Petroleum Resources, *in* Petroleum Admin. For War, *Petroleum in War and Peace* 1 (1945)...................................16

Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, *Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams* (Aug. 12, 1942) ................................................................18

W.J. Sweeney et al., *Aircraft Fuels and Propellants: Report Prepared for the AAF Scientific Advisory Group* (1946) ....................................................19

War Emergency Pipelines, Inc., *"Big Inch" and "Little Big Inch" In Brief* (Feb. 28, 1946) ...............................19

Daniel Yergin, *The Prize: The Epic Quest for Oil, Money, and Power* (1990)...........................................15

## INTEREST OF THE *AMICI CURIAE*[1]

The Chamber of Commerce of the United States of America ("Chamber") is the world's largest business federation.[2]  It represents approximately 300,000 direct members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every industry sector, and from every region of the country.  An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts.  To that end, the Chamber regularly files amicus curiae briefs in cases, like this one, that raise issues of concern to the nation's business community.

The National Association of Manufacturers ("NAM") is the largest manufacturing association in the United States, representing small and large manufacturers in every industrial sector and in all 50 states and in every industrial sector.  Manufacturing employs nearly 13 million men and women, contributes $2.9 trillion to the U.S. economy annually, has the largest economic impact of any major sector, and accounts for over half of all private-sector research and development in the Nation.  The NAM is the voice of the manufacturing community and the leading

---

[1] All parties have consented to the filing of this brief.  *See* Fed. R. App. P. 29(a)(2).

[2] No counsel for any party authored this brief in whole or in part, and no entity or person, aside from *amici curiae*, their members, or their counsel, made any monetary contribution intended to fund the preparation or submission of this brief.

advocate for a policy agenda that helps manufacturers compete in the global economy and create jobs across the United States.

Many of the Chamber's and the NAM's members perform vital functions for the United States while acting under the direction and control of federal officers. The Chamber's and the NAM's members are sometimes exposed to potential liability for the performance of those functions. Thus, the Chamber and the NAM have a strong interest in ensuring that the federal officer removal statute, 28 U.S.C. § 1442(a), is correctly interpreted so that claims arising from work done under the direction of federal officers are heard in federal courts, and not in state courts where local interests may sometimes be given undue weight.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

For more than two centuries, Congress has provided some form of removal jurisdiction to ensure that federal agencies, federal officers, and those assisting the federal government in the conduct of its business have access to a federal forum insulated from local interests and potential biases. The current federal officer removal statute, 28 U.S.C. § 1442(a), requires a private defendant to show, in pertinent part, that (1) the defendant was "acting under" a federal officer, and (2) the underlying claims are "for or relating to," *i.e.*, connected to or associated with, the defendant's conduct "acting under" the federal officer.

One way that a private defendant can "act[] under" a federal officer is "to assist, or to help carry out, the duties or tasks of the federal superior." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 152 (2007). This Court has confirmed that "acting under" does not require a removing defendant to show that "its alleged conduct was precisely dictated by a federal officer's directive." *St. Charles Surgical Hosp. LLC v. La. Health Serv. & Indem. Co.*, 990 F.3d 447, 454 (5th Cir. 2021).

Yet the district court somehow reached the opposite conclusion, and held that a removing defendant must show it was "acting under" a federal officer in carrying out a *specific* directive to engage in the activity that provides the basis for the plaintiff's suit. That conclusion ignored case law establishing that the "acting under" requirement of § 1442(a) does not require the specificity that the district court demanded, and that the touchstone of the "acting under" analysis is whether a removing defendant helps a federal agency or officer carry out its governmental functions. The district court's construction would discourage private entities from assisting in the performance of the federal government's functions, as there would be no certainty on whether a directive is "specific" enough to entitle a private defendant to a federal forum.

Under the correct standard, a defendant can show that it was "acting under" a federal officer by demonstrating that it was assisting the federal government in performing a function that the federal government otherwise would have had to

fulfill on its own.  As this Court indicated in *Plaquemines Parish v. Chevron USA, Inc.*, No. 22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) ("*Plaquemines II*"), refineries that "had federal contracts and acted pursuant to those contracts" satisfy this requirement.

There is no dispute that The Texas Company and the Gulf Oil Company had such refining contracts with the federal government during the Second World War, and that the companies used crude oil they produced to fulfill the federal government's orders for refined petroleum products.  The companies did so under the watchful oversight of the Petroleum Administration for War, which, at the time, exercised near-plenary authority over every detail of petroleum production.  That is enough to demonstrate that the two companies "acted under" federal officers during the Second World War.  The fact that the federal contracts did not specifically require the two companies to produce the crude oil used to fulfill the government's orders for refined petroleum products should make no difference in the "acting under" analysis.  The companies' crude-oil production was part of how the companies "carr[ied] out the duties or tasks of the federal superior":  fulfilling a contractual obligation to produce supplies essential to the federal government's wartime needs.

The district court erred in concluding otherwise, and its remand order should be reversed.

# ARGUMENT

I. **The district court's overly narrow reading of the "acting under" requirement for federal officer removal contravenes binding precedent, which requires only a relationship in which the removing private defendant assists a federal agency or officer's performance of governmental functions.**

Under 28 U.S.C. § 1442(a), "[a] civil action … that is commenced in a State court and that is against or directed to" "any officer (or any person acting under that officer) of the United States or of any agency thereof, … for or relating to any act under color of such office" may be removed to federal court. To remove a case under § 1442(a), a defendant need only show that "(1) it has asserted a colorable federal defense, (2) it is a 'person' within the meaning of the statute, (3) that has acted pursuant to a federal officer's directions, and (4) the charged conduct is connected or associated with an act pursuant to a federal officer's directions." *Port of Corpus Christi Auth. of Nueces Cnty. v. Port of Corpus Christi L.P.*, 57 F.4th 432, 436 (5th Cir. 2023) (citation omitted). Because federal officer jurisdiction is not "narrow or limited," *Texas v. Kleinert*, 855 F.3d 305, 311 (5th Cir. 2017) (citation and internal quotation marks omitted), the statute is construed "in favor of a federal forum." *Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859 (5th Cir. 2021) (citation omitted).

The district court wrongly concluded that the third factor—whether the removing private defendant "acted pursuant to a federal officer's … directions"— failed to support removal under § 1442(a). The court construed "acting under"

narrowly by requiring a removing defendant to show that a plaintiff's claims are "tethered" to a "specific federal directive," and not just the relationship that a private defendant has in providing assistance to the federal government. *Par. of Plaquemines v. Northcoast Oil Co.*, No. 18-cv-5228, 2023 WL 2986371, at *5, *9 (E.D. La. Apr. 18, 2023) ("*Northcoast*") (citation omitted), *appeal docketed*, No. 23-30304 (5th Cir. May 5, 2023).[3]

But this Court has said exactly the opposite about the "acting under" requirement: "a removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive." *St. Charles Surgical Hosp.*, 990 F.3d at 454.

That holding by this Court is consistent with how the "acting under" requirement has been historically applied to private defendants—the relevant inquiry has always been whether there was a relationship in which the private defendant provided assistance to the federal government, not whether the defendant performed specific directions giving rise to the plaintiff's claims. In *Watson v. Philip Morris Cos.*, 551 U.S. 142 (2007), the Supreme Court explained that a private person is "acting under" a federal officer when the relationship between the private person

---

[3] The district court's remand order stated only that it was ordering remand "[f]or the same reasons given" in *Northcoast*. ROA.39699. Because the *Northcoast* decision contains the substance of the district court's reasoning, this brief treats the reasoning of *Northcoast* as the district court's reasoning here.

and the federal officer "involve[s] an effort to assist, or to help carry out, the duties or tasks of the federal superior." *Id.* at 152. The Court cited the example of a private contractor working for the federal government as one kind of relationship that "turn[s] a private contractor into a private firm 'acting under' a Government 'agency' or 'officer.'" *Id.* at 153. "[P]rivate contractor[s] in such cases," the Court explained, "help[] the Government to produce an item that it needs," *i.e.*, "perform[ing] a job that, in the absence of a contract with a private firm, the Government itself would have had to perform." *Id.* at 153-54.

This Court's decisions confirm that a defendant can establish that it was "acting under" a federal officer by showing that it assisted the federal government in fulfilling the government's needs, particularly where there is a contract between the federal government and the private removing defendant. In *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc), for example, this Court held that a company hired by the U.S. Navy to install asbestos on its ships could rely on § 1442(a) to remove a suit by a former employee who claimed he contracted mesothelioma because he was exposed to asbestos while working on one of those ships, the Tappahannock. *Id.* at 289-90. The Court held that the company demonstrated it "acted 'pursuant to a federal officer's directions'" by virtue of "its federal contract with the Navy for repairs to the *Tappahannock*." *Id.* at 291 (citation omitted). The Court reached this conclusion despite the district court's finding that

neither "the United States [n]or any of its officials controlled Avondale's safety practices," *id.* at 290; in other words, the plaintiff's claims were not linked to a specific federal directive on safety.

Similarly, in *Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914 (5th Cir. Mar. 20, 2023), this Court held that a subcontractor providing benefits to Medicare enrollees could remove an unjust enrichment claim brought by a care provider asserting that it was wrongly denied reimbursement. In addressing the "acting under" requirement, the Court determined that the Centers for Medicare and Medicaid Services had an "unusually close" relationship with the subcontractor because the subcontractor "assisted CMS in administering Medicare benefits on behalf of the federal government." *Id.* at *3. The fact that the subcontractor "was subject to extensive 'detailed regulation, monitoring, [and] supervision' by the federal government *while it was assisting* the government in carrying out its delegated duties" went "a step further" in establishing the "unusually close relationship" between a private party and a federal officer needed for federal officer removal. *Id.* (citation omitted).

And, most relevant here, this Court in *Plaquemines II* agreed with the proposition that refiners "who had federal contracts" during the Second World War "and acted pursuant to those contracts, can likely remove" a case relating to the wartime production of petroleum products. 2022 WL 9914869, at *3. As explained

8

below, pp. 19-25, *infra*, The Texas Company and the Gulf Oil Company acted pursuant to their refining contracts with the federal government when producing the crude oil to be used as part of those contracts, and thus "acted under" a federal officer for purposes of § 1442(a).

Other circuits have likewise recognized that a private contractor's provision of services to fulfill a need of the federal government is enough to satisfy § 1442(a)'s "acting under" requirement. For example, the Third Circuit, following the Seventh Circuit's lead, has held that where "'the federal government uses a private corporation to achieve an end it would have otherwise used its own agents to complete,' that contractor is 'acting under' the authority of a federal officer." *Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 812 (3d Cir. 2016) (quoting *Ruppel v. CBS Corp.*, 701 F.3d 1176, 1181 (7th Cir. 2012)). In so holding, the Third Circuit rejected the notion that private contractors have a "special burden" of showing that they were "acting under the control of the federal government," or that "the complained-of conduct was done at the specific behest of the federal officer or agency." *Id.* at 812-13. The First and Eleventh Circuits have also recognized that when an entity fulfills the needs of the federal government, that sufficiently demonstrates that the entity is "acting under" a federal agency or officer. *Genereux v. Am. Beryllia Corp.*, 577 F.3d 350, 357 n.9 (1st Cir. 2009) (noting that defendant's removal was based on fact that it supplied beryllium-containing products to government contractor as part of

contractor's manufacturing of military hardware); *Caver v. Cent. Ala. Elec. Co-op.*, 845 F.3d 1135, 1143-44 (11th Cir. 2017) (rural energy cooperative is "acting under" federal government where it "fulfill[s] the congressional objective of bringing electricity to rural areas that would otherwise go unserved").

The district court's imposition of a "specific federal directive" requirement is an end-run around this Court's decision in *Latiolais*, which expressly held that the phrase "for or relating to any act under color of such office," as used in § 1442(a)(1), does not require a private defendant to show that a federal officer's direction *caused* a plaintiff's claims. 951 F.3d at 292, 296 ("Accordingly, we overrule *Bartel* and its progeny to the extent that those cases erroneously relied on a 'causal nexus' test after Congress amended section 1442(a) to add 'relating to.'"). Specifically, *Latiolais* addressed whether a causal nexus test imposed under a previous version of § 1442(a), which allowed removal only in suits "for any act under color of such [federal] office," still applied under the current § 1442(a), which expanded the statute's scope to include suits "for *or relating to* any act under color of such office." 951 F.3d at 291-92 (emphasis added). Under the causal nexus test, removing private defendants had to demonstrate that federal officers issued specific orders, the implementation of which led to the plaintiff's alleged claims. *E.g.*, *Bartel v. Alcoa S.S. Co.*, 805 F.3d 169, 174 (5th Cir. 2015) (in addressing the removal of asbestos-exposure claims similar to those later seen in *Latiolais*, concluding that there was no

basis for federal officer removal because "[t]here is no evidence that the government ever issued orders of any kind, let alone orders relating to safety procedures or asbestos")*, overruled by Latiolais*, 951 F.3d 286. *Latiolais* made clear that Congress's addition of the phrase "or relating to" meant that such a showing of causation was no longer necessary, and that merely showing a connection to, or association with, the direction of a federal officer suffices to satisfy the federal officer removal statute. 951 F.3d at 292.

The district court's holding effectively nullifies *Latiolais*' key holding by resurrecting the specific-order requirement and making it part of § 1442(a)'s "acting under" language, rather than "for or relating to." As the Third Circuit explained in rejecting a similar argument—*i.e.*, that a defendant must show it was acting "pursuant to a *federal duty* in engaging in the complained-of conduct"—the district court's construction would strip the "relating to" language at issue in *Latiolais* of any significance. *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457, 470 (3d Cir. 2015). "Framing the inquiry in this manner essentially collapses the 'acting under' inquiry into the requirement that the complained-of conduct be 'for, or relating to,' an act under color of federal office." *Id.* The Third Circuit recognized that imposing a specific "federal duty" requirement as part of the "acting under" analysis would import a causation inquiry "narrower than the one Congress has written into the statute." *Id.* This Court

should reach a similar conclusion, and reaffirm that a "specific federal directive" to engage in the conduct that gives rise to a plaintiff's suit is not required to show that a private contractor was "acting under" a federal agency or officer.

## II.   The district court's narrow construction of "acting under" will create forum uncertainty that will discourage private companies from providing assistance to the federal government.

Federal officer removal jurisdiction has existed in some form since the War of 1812, reflecting Congress's desire to protect those carrying out the functions of the federal government "from interference by hostile state courts." *Watson*, 551 U.S. at 148 (citation omitted). And this form of jurisdiction has historically included not just federal officials, but also "any other person aiding or assisting" those officials in the performance of their duties. *Id.* (citation omitted). Congress's decision to extend federal removal jurisdiction to "a private person [who] acts as an assistant to a federal official in helping that official to enforce federal law" reflects the legislature's recognition that such private parties may need to be protected from "[s]tate-court proceedings" that "reflect 'local prejudice' against unpopular federal laws or federal officials." *Id.* at 150-51. In essence, federal officer removal jurisdiction ensures that those serving the needs of the federal government are entitled to a neutral forum in federal court if their work for the government ends up being the subject of litigation, so that federal protections may be properly applied and not slighted in favor of state interests. *E.g.*, *Willingham v. Morgan*, 395 U.S.

402, 407 (1969) ("[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in federal court.").

Providing a fair, federal forum for those who serve the needs of the federal government "vindicates also the interests of government itself," *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (Friendly, J.), by ensuring that states cannot "arrest[]" the "operations of the general government" through actions against the government's agents and those who assist them, *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). Congress has long recognized that federal officers (and those providing assistance to them) would be discouraged and deterred from fulfilling the needs of the national government if they were subjected to state-court prosecution or suit for their work. *Watson*, 551 U.S. at 150 (recounting examples where states interfered with federal operations by arresting and bringing to trial in state court "officers and agents of the Federal Government acting … within the scope of their authority" (citation and internal quotation marks omitted)); *Louisiana v. Sparks*, 978 F.2d 226, 232 (5th Cir. 1992) ("[T]he Supreme Court has for over two decades required a liberal interpretation of § 1442(a) in view of its chief purpose—to prevent federal officers who simply comply with a federal duty from being punished by a state court for doing so."); *see also* Stanley I. Kutler, *Judicial Power and Reconstruction Politics* 149-50 (1968) (in enacting Reconstruction-era federal-

13

officer removal provisions, "[a]s usual, Congress acted to protect federal officials who were sued or prosecuted for acts committed under color of law").

Stripping private contractors, and others assisting the federal government, of the certainty and predictability of a federal forum by imposing an ungrounded "specific federal directive" requirement would inevitably have "a chilling effect on [the] acceptance of government contracts," *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 134 (2d Cir. 2008), as private companies doing the federal government's work simply would not know where they might be sued, and whether they would be treated fairly once in court. That, in turn, would substantially burden the federal government's own interests, as the reluctance of private companies to provide assistance to the federal government would inevitably affect the government's ability to fulfill its needs "at a reasonable cost." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998) (quoting *Winters v. Diamond Shamrock Chem. Co.*, 901 F. Supp. 1195, 1200 (E.D. Tex. 1995)) (internal quotation marks omitted).

Moreover, a requirement that a private contractor must show it was "acting under" a "specific federal directive" to engage in the challenged conduct in order to remove a case under § 1442(a) is founded on an unrealistic understanding of the federal government's relationship with its contractors and subcontractors. True, fulfilling the government's needs often comes with many details and extensive

oversight. But it is simply unrealistic to expect federal directives on every possible detail over which a plaintiff might sue—especially for the sort of claims that are based on the consequences of a private party's work for the government that allegedly emerge only years, if not decades, later. Limiting federal officer removal to what the federal government had the foresight to specifically dictate at the point of supply would risk subjecting companies assisting the government to the anomalous result of having to face lawsuits in both federal and state court *over the same body of work.*

These considerations only reinforce the conclusion required by precedent: the district court was wrong to hold that a private defendant removing a case under § 1442(a) must show it was "acting under" a "specific federal directive" to carry out the specific conduct being challenged.

### III. Much like the rest of the petroleum industry, The Texas Company and the Gulf Oil Company "acted under" federal officers during the Second World War by producing refined petroleum products to fulfill contracts with the federal government.

For more than 100 years, the United States armed forces have relied on oil to maintain their dominance in the air, on land, and at sea. *See generally* Daniel Yergin, *The Prize: The Epic Quest for Oil, Money, and Power* 151 (1990) (describing, among other things, the use of petroleum products in armed conflicts, starting with the First World War—"a war that was fought between men and machines … machines … powered by oil"). Oil began to play a critical role in the national

defense when it became clear to the United States Navy that oil was far more efficient than coal to fuel the fleet—with oil, ships could "travel twice as far," carry smaller boilers, conceal their presence (by creating less smoke), and achieve greater speed.  Erik J. Dahl, *Naval Innovation:  From Coal to Oil*, Joint Force Quarterly 51, 54 (Winter 2000-2001).   President Taft publicly acknowledged oil's strategic importance in a 1910 address to Congress, where he declared that "the federal government is directly concerned both in encouraging rational development and at the same time insuring the longest possible life to the oil supply." *Hearings Before H. Comm. on Naval Affairs on Estimates Submitted by the Secretary of the Navy*, 63d Cong. 761 (1915).

During the Second World War, oil became "a bulwark of our national security."  Nat'l Petroleum Council, *A National Oil Policy for the United States* 1 (1949).  The petroleum industry was "joined in the service of the Nation," as without oil, the armed services "could neither fight nor live."  John W. Frey & H. Chandler Ide, *A History of the Petroleum Administration for War* 1941-1945, at 1 (U.S. Gov't Printing Office 1946) ("*PAW History*").  The industry practically became an "arm[] of this Government."   Statement of Senator Joseph C. O'Mahoney, Chairman, Special Committee to Investigate Petroleum Resources, *in* Petroleum Admin. For War, *Petroleum in War and Peace* 1 (1945).

16

In 1941, President Franklin Roosevelt created the Office of Petroleum Coordinator for National Defense to manage the nation's petroleum resources during the time of war. *PAW History* at 14. But the new Office lacked "compulsory power or authority," and "represented a relatively weak basis on which to conduct an agency that was destined to administer one of the most vital phases of the war program." *Id.*

So, in December 1942, President Roosevelt replaced the Office of Petroleum Coordinator with the Petroleum Administration for War ("PAW"). *Id.* at 44; *see also* Exec. Order No. 9,276, 7 Fed. Reg. 10,091 (Dec. 4, 1942). PAW was given "a broad delegation of war authority," and its Administrator had "the power to issue and enforce necessary orders and directives regulating all the operations of the vast petroleum industry." *PAW History* at 44-45. The Administrator was charged with "issu[ing] in his own name directives and orders to the petroleum industry covering the production, refining, treating, storage, shipment, receipt, and distribution within the industry of petroleum and its products." *Id.* at 46.

Both the Petroleum Coordinator and PAW (together with the Defense Supplies Corporation) entered into contracts for the production of petroleum-based products, such as high-octane fuel for planes ("avgas"), *Shell Oil Co. v. United States*, 751 F.3d 1282, 1286 (Fed. Cir. 2014); *Exxon Mobil Corp. v. United States*, Nos. 10-2386, 11-1814, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020),

including the contracts described in Defendants' Opening Brief (at 34-42), which link Plaintiffs' claims to The Texas Company and the Gulf Oil Company's production contracts with the federal government during the Second World War. While both PAW and the petroleum industry painted the relationship as one of coordination and cooperation, there was no question that PAW made offers that the industry could not refuse: "PAW told the refiners what to make, how much of it to make, and what quality." *PAW History* at 219. "Nobody wanted it to be that way— neither PAW nor the refiners. It just happened to be the only way to do it in wartime." *Id.*

Oil companies lacked "freedom to make a choice between contracting and not contracting." *Exxon Mobil Corp. v. United States*, 108 F. Supp. 3d 486, 496 (S.D. Tex. 2015). And if a company failed to comply with PAW's demands, it could lose access to crude oil supplies, face restricted access to transportation, and face the withholding of federal assistance. Telegram from P.M. Robinson, PAW Assistant Director of Refining, to Ralph K. Davies, PAW Deputy Administrator, *Refiners Who Did Not Reply to the Gasoline Yield Reduction Telegrams* (Aug. 12, 1942). PAW even had the power to seize the refineries of uncooperative companies. *Exxon Mobil*, 108 F. Supp. 3d at 496.

Doing business with PAW did not mean business as usual—to the contrary, oil companies were expected to make considerable sacrifices at PAW's behest, to

meet the nation's shifting and growing needs.  Companies thus "undert[ook] extraordinary modes of operation which were often uneconomical and unanticipated at the time of" contracting, and were responsible for "assum[ing] the costs of such uneconomical operations."  *Shell*, 751 F.3d at 1287.  Refiners often had to modify their equipment and change their operations to produce avgas and fuel for particular engines.  *E.g.*, W.J. Sweeney et al., *Aircraft Fuels and Propellants:  Report Prepared for the AAF Scientific Advisory Group* 40 (1946) ("The refiner cannot build the equipment for making the fuel without knowing what its composition must be to meet the needs of the [aircraft] engine.").  And a non-profit entity backed by the largest oil companies, War Emergency Pipelines, Inc., was charged with building the Big Inch and Little Big Inch pipelines, which ensured that the Eastern Seaboard had ready access to "essential petroleum supplies."  War Emergency Pipelines, Inc., *"Big Inch" and "Little Big Inch" In Brief* 2 (Feb. 28, 1946).  "[T]he actual physical control of the facilities" was given to the PAW Administrator, and "[a]ny profit accruing from the operations was made by the Government, not by War Emergency Pipelines, Inc., nor the oil industry."  *Id.*

The Texas Company's and the Gulf Oil Company's refining agreements with the federal government arose in this unique wartime setting; those agreements, under *Plaquemines II*, demonstrate that both companies "acted under" federal officers. 2022 WL 9914869, at *4 (agreeing with the district court's observation that

"refineries, who had federal contracts and acted pursuant to those contracts, can likely remove [under § 1442]"). Like many others in their industry, the two companies were conscripted into the federal government's efforts to ensure that our armed forces were adequately supplied. That conscription was memorialized in the hundreds of contracts that the two companies had to produce avgas and other war materials. *E.g.*, Defs.' Opening Br. 14-17 (describing The Texas Company's refining contracts with the federal government); *id.* at 17-19 (describing the Gulf Oil Company's refining contracts). As Defendants explain (at 34-49), Plaintiffs' claims are "connected or associated with" the fulfillment of those agreements.

The federal government's agreements with The Texas Company and the Gulf Oil Company are more than sufficient to establish a basis for federal officer removal. The two companies were part of "an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior"—namely, the production of refined petroleum products. *Watson*, 551 U.S. at 152. They "performed a job that, in the absence of a contract with a private firm, the Government itself would have had to perform": maintaining the steady supply of oil. *Id.* at 154. Indeed, PAW went so far as to threaten that very outcome (*i.e.*, performing the job itself by seizing refineries) if companies did not cooperate. *Exxon Mobil*, 108 F. Supp. 3d at 496. These contracts establish the "special" and "unusually close" relationship needed to demonstrate that the companies had "acted under" a federal agency or officer.

20

The fact that PAW maintained such pervasive control over every aspect of the petroleum industry reinforces the "unusually close" relationship necessary for federal officer removal that is already established by the two companies' refining contracts. *See Trinity Home Dialysis*, 2023 WL 2573914, at *3 (private defendant "goes a step further in demonstrating … 'unusually close relationship' by also showing that it was subject to extensive 'detailed regulation, monitoring, [and] supervision' by the federal government *while it was assisting* the government in carrying out its delegated duties" (quoting *Watson*, 551 U.S. at 153)).  As the history of PAW makes clear, there was no part of the petroleum industry that was not under PAW's oversight and supervision.

The district court correctly acknowledged that the two companies' oil refining contracts with the federal government were sufficient to demonstrate that the companies "acted under" federal officers. *E.g.*, *Northcoast*, 2023 WL 2986371, at *10 ("Gulf Oil may have acted under a federal officer when refining oil in Port Arthur, Texas.").  The court even went so far as to "conclude that [the two companies'] World War II era [crude] oil production operations … are connected to [the companies'] aviation gas refining in Port Arthur, the latter being conducted pursuant to" federal contracts.  *Id.* at *8.  But the court erred by holding that, because (1) Plaintiffs' claims are ultimately about the production of crude oil, rather than the refining of it and (2) the two companies lacked contracts with the government to

produce crude oil, the companies did not "act under" the authority of the federal government when it engaged in the World War II-era conduct on which Plaintiffs' claims are based. *Id.*

The district court should not have focused its "acting under" analysis on whether the relevant contracts specifically covered crude oil production. To be sure, if the two companies had express, specific agreements with the wartime national government to produce crude oil, *in addition to* the refinery contracts at issue in this case, the crude-oil production agreements would have provided a *separate* basis for the "unusually close" relationship needed for federal officer removal. But Defendants did not need to provide evidence of such express agreements (i.e., agreements specifically referring to crude oil production) with the federal government to demonstrate that The Texas Company and the Gulf Oil Company were "acting under" federal officers. Even assuming some express agreement with the federal government is necessary to show that a private defendant "assist[ed]" or "help[ed] carry out[] the duties or tasks of the federal superior," *Watson*, 551 U.S. at 152,[4] Defendants demonstrated that the two companies had such agreements here—

---

[4] This Court has held that a private subcontractor does not need to be in "direct privity of contract" with the federal government itself to be "acting under" a federal officer. *E.g.*, *Trinity Home Dialysis*, 2023 WL 2573914, at *3. That is because the touchstone of the analysis is whether the defendant "was *performing* obligations that [the federal government] would have otherwise been required to provide 'in the absence of [the] contract [between the principal contractor and the government].'" *Id.* (emphasis added). *Plaquemines II* does not suggest otherwise—there, the court

namely, agreements to produce refined military grade fuel and avgas. Put differently, it is enough that the companies produced the crude oil that was used to fulfill the companies' obligations to the federal government—even if the government did not specifically order the companies to also take the preceding step of producing crude oil. *Cf. Genereux*, 577 F.3d at 357 n.9 (noting federal officer removal on the basis that the defendant provided *components* to a federal contractor producing "military hardware" for the federal government).

The district court's analysis was also detached from the realities of wartime petroleum production, in that it was PAW, not The Texas Company or the Gulf Oil Company, that maintained ultimate authority over what the two companies could do with their stockpiles of crude oil. The district court's speculation that the companies had "complete latitude under the contract to forego producing any crude," *Northcoast*, 2023 WL 2986371, at *10, overlooks PAW's broader oversight and supervision of all things production-related. PAW used its authority to ensure that refiners not only received the quantity of crude oil they needed, but also the right kind. *PAW History* at 215.

---

merely held that a supplier relationship with a federal contractee does not automatically establish the kind of subcontractor relationship that might show a private defendant was "acting under" a federal officer even without an express agreement with the government. 2022 WL 9914869, at *3.

And there was no need for the contracts to specifically address the issue of crude oil production. PAW had the authority to direct The Texas Company and the Gulf Oil Company to distribute their crude oil supplies however PAW saw fit. PAW was well aware of the two fields used for the crude oil production at issue here, ROA.34430, ROA.34435; if PAW wanted to redirect the supplies from those fields elsewhere, it would have done so. The fact that PAW did not disturb the two companies' use of their crude oil stockpiles for fulfilling the federal government's contracts for avgas and other war materials at the Port Arthur refineries supports the notion that PAW approved of such use.

The security of the nation and the fate of the free world depended on PAW's ability to seamlessly orchestrate the supply of a vital resource to the nation's armed forces. The federal government secured that supply in part by entering into contracts with The Texas Company and the Gulf Oil Company for the production of refined petroleum products. There is no dispute that the two companies fulfilled those contracts by using crude oil supplies drawn from the two oil fields at issue here, and that PAW exercised oversight as part of its all-encompassing involvement in the wartime petroleum industry. These facts demonstrate that the two companies had an "unusually close" relationship with the federal government during the Second World War. That relationship satisfies § 1442(a)'s "acting under" requirement today.

## CONCLUSION

This Court should reverse the district court's remand order.

Respectfully submitted,

/s/ *Andrew Kim*

Andrew Kim
William M. Jay
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
(202) 346-4000
*andrewkim@goodwinlaw.com*

*Counsel for Amici Curiae*

Andrew R. Varcoe
Jonathan D. Urick
U.S. CHAMBER LITIGATION CENTER
1615 H Street, NW
Washington, DC 20062

*Counsel for the Chamber of
Commerce for the United States of
America*

Michael A. Tilghman II
NATIONAL ASSOCIATION OF
MANUFACTURERS
733 10th Street, NW, Suite 700
Washington, DC 20001
(202) 637-3100

*Counsel for the National
Association of Manufacturers*

**CERTIFICATE OF SERVICE**

I, Andrew Kim, hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system on July 3, 2023.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  July 3, 2023

/s/ Andrew Kim
Andrew Kim
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, D.C. 20036
Telephone: (202) 346-4000
andrewkim@goodwinlaw.com

*Counsel for Amici Curiae*

## RULE 32(A) CERTIFICATE OF COMPLIANCE

This brief complies with the type volume limitations of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B) because it contains 5,912 words, excluding the parts exempted by Rule 32(f) and Fifth Circuit Rule 32.2.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Rule 32(a)(6) because it appears in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

Dated:  July 3, 2023                    */s/ Andrew Kim*
                                        Andrew Kim
                                        GOODWIN PROCTER LLP
                                        1900 N Street N.W.
                                        Washington, D.C. 20036
                                        Telephone: (202) 346-4000
                                        andrewkim@goodwinlaw.com

                                        *Counsel for Amici Curiae*