# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 29, 2024

Lyle W. Cayce
Clerk

No. 23-30294

PLAQUEMINES PARISH,

*Plaintiff—Appellee*,

LOUISIANA STATE; LOUISIANA DEPARTMENT OF NATURAL RESOURCES, *Office of Coastal Management, Thomas F. Harris, Secretary*,

*Intervenors—Appellees*,

*versus*

BP AMERICA PRODUCTION COMPANY, As *Successor in Interest to* AMOCO PRODUCTION COMPANY; BURLINGTON RESOURCES OIL & GAS COMPANY, L.P.; CHEVRON USA, INCORPORATED, As *Successor in Interest to* CHEVRON OIL COMPANY, THE CALIFORNIA COMPANY and GULF OIL CORPORATION; EXXON MOBIL CORPORATION, As *Successor in Interest to* THE SUPERIOR OIL COMPANY; SHELL OFFSHORE, INCORPORATED; SHELL OIL COMPANY; CHEVRON U.S.A. HOLDINGS, INCORPORATED, As *Successor in Interest to* TEXACO E&P INCORPORATED. and TEXACO INCORPORATED; TEXAS COMPANY; CHEVRON PIPE LINE COMPANY, As *Successor in Interest to* GULF REFINING COMPANY,

*Defendants—Appellants*,

CONSOLIDATED WITH

No. 23-30422

Parish of Cameron,

*Plaintiff—Appellee,*

State of Louisiana, *ex rel, on behalf of* Jeff Landry; State of Louisiana, *on behalf of Louisiana Department of Natural Resources, on behalf of Office of Coastal Management, on behalf of Thomas F. Harris,*

*Intervenor Plaintiffs—Appellees,*

*versus*

BP America Production Company; Chevron U.S.A. Incorporated, own capacity & *as successor in interest, on behalf of* California Company; Shell Oil Company; SWEPI, L.P.,

*Defendants—Appellants.*

_____

Appeals from the United States District Courts
for the Eastern and Western Districts of Louisiana
USDC Nos. 2:18-CV-5256, 2:18-CV-688

_____

Before Davis, Engelhardt, and Oldham, *Circuit Judges.*
W. Eugene Davis, *Circuit Judge*:

This consolidated appeal concerns whether lawsuits commenced in state court by Louisiana parishes against various oil and gas companies for their alleged state-law violations give rise to federal jurisdiction. The companies removed these cases to federal court pursuant to the federal officer removal statute, 28 U.S.C. § 1442(a)(1), asserting that they satisfy each of the statute's requirements in light of their refining contracts with the government during World War II. The district courts granted the parishes' motions to remand these cases to state court after concluding that the oil companies did not meet their burden of establishing federal jurisdiction. The

No. 23-30294
c/w No. 23-30422

oil companies now appeal those decisions. Because we conclude these cases were not properly removed under the federal officer removal statute, we AFFIRM the district courts' orders remanding these cases to state court.

## I.

This litigation has a long procedural history, including two prior appeals to this Court. It originated in 2013 when several Louisiana coastal parishes, joined by the Louisiana Attorney General and the Louisiana Secretary of Natural Resources, filed forty-two lawsuits against various oil and gas companies in state court alleging violations of Louisiana's State and Local Coastal Resources Management Act of 1978 ("SLCRMA").

SLCRMA took effect in 1980, and requires parties engaging in certain "uses" within Louisiana's "coastal zone" to comply with a permitting scheme.[1] It defines "use" to include any "activity within the coastal zone which has a direct and significant impact on coastal waters," and defines "Coastal Zone" to include "the coastal waters and adjacent shorelands," defined by Louisiana law, that "are strongly influenced by each other."[2] As relevant here, SLCRMA creates a cause of action against parties that violate or fail to obtain the requisite coastal use permit.[3] However, there are several exemptions to SLCRMA's permitting requirement, including a "grandfather clause," which states that: "[i]ndividual specific uses legally commenced or established prior to the effective date of the coastal use permit program shall not require a coastal use permit."[4]

---

[1] La. Stat. Ann. § 49:214.30(A)(1).

[2] *Id.* § 49:214.23(5), (13).

[3] *Id.* § 214.36 (D)–(E).

[4] *Id.* § 214.34(C)(2).

3

No. 23-30294
c/w No. 23-30422

In each lawsuit, the coastal parishes sued various oil companies for their oil and gas exploration, production, and transportation operations in a different "Operational Area"[5] of the Louisiana coast. The parishes' "materially identical" petitions "allege that the companies violated SLCRMA by failing to obtain necessary coastal use permits or by violating the terms of the permits they did obtain."[6] Additionally, the parishes contend that the companies' pre-SLCRMA activities were not "lawfully commenced" and therefore do not fall within the grandfather clause exemption which would excuse such noncompliance.[7] The parishes seek damages under SLCRMA, including for "restoration and remediation costs; actual restoration of disturbed areas to their original condition; costs necessary to clear, revegetate, detoxify and otherwise restore the affected portions of the . . . Coastal Zone as near as practicable to its original condition."

The oil companies have attempted to remove these cases to federal court on three separate occasions.[8] First, in 2013, the companies removed these cases on the grounds of federal question, general maritime law, the Outer Continental Shelf Lands Act, and diversity jurisdiction. The federal

---

[5] "The term 'Operational Area' is used throughout the plaintiffs' petition to describe the geographic extent of the area within which the complained-of operations and activities at issue in this action occurred." *Par. of Plaquemines v. Northcoast Oil Co.*, No. 18-5228, 2023 WL 2986371, at *1 (E.D. La. Apr. 18, 2023).

[6] *Par. of Plaquemines v. Chevron USA, Inc.* (*Plaquemines I*), 7 F.4th 362, 366 (5th Cir. 2021).

[7] *Id.*

[8] "A defendant who fails in an attempt to remove on the initial pleadings can file a second removal petition *when subsequent pleadings or events reveal a new and different ground for removal*." *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 492–93 (5th Cir. 1996) (emphasis in original) (internal quotation marks and citation omitted).

No. 23-30294
c/w No. 23-30422

district courts rejected all four jurisdictional bases and remanded the cases to state court.[9]

After returning to state court, the oil companies filed motions seeking clarification about the specific state law violations underlying the parishes' lawsuits.[10] In response, in April of 2018, Plaquemines Parish issued an expert report—the *Rozel* report— in one of the pending cases, and certified that the report "represented the position of the Louisiana Department of Natural Resources in all forty-two cases."[11] The *Rozel* report "triggered" the potential application of SLCRMA's grandfather clause by placing at issue the companies' pre-SLCRMA conduct, including conduct that occurred during World War II.[12] Specifically, the *Rozel* report opined that the oil companies' pre-1980 production activities were not "lawfully commenced or established" for purposes of the grandfather clause because such activities did not begin in "good faith" by departing from prudent industry practices.[13]

According to the oil companies, the *Rozel* report "unveiled a new legal theory," which they relied on to remove these cases to the Eastern and Western Districts of Louisiana, this time alleging federal question and federal officer jurisdiction.[14] The parishes again moved to remand the cases to state court. The Eastern District of Louisiana designated *Plaquemines Parish v.*

---

[9] *See, e.g.*, *Par. of Plaquemines v. Total Petrochemical & Refin. USA, Inc.*, 64 F. Supp. 3d 872, 906 (E.D. La. 2014).

[10] *Par. of Plaquemines v. Riverwood Prod. Co.* (*Riverwood I*), No. 18-5217, 2019 WL 2271118, at *2 (E.D. La. May 28, 2018), *aff'd in part, rev'd in part and remanded sub nom. Plaquemines I*, 7 F.4th 362.

[11] *Plaquemines I*, 7 F.4th at 366–67.

[12] *Northcoast*, 2023 WL 2986371, at *1.

[13] *Plaquemines I*, 7 F.4th at 367.

[14] *Id.*

No. 23-30294
c/w No. 23-30422

*Riverwood Production Co.* as the lead case and stayed the other cases pending a decision in *Riverwood*. The Western District of Louisiana adopted a similar approach and designated *Cameron Parish v. Auster Oil & Gas, Inc.*, as the lead case in that district.[15]

The courts in both *Riverwood I* and *Auster* ultimately granted the parishes' remand motions after concluding that neither federal question nor federal officer jurisdiction existed.[16]  The oil companies appealed both decisions, and we consolidated the cases on appeal.  In *Plaquemines I*, this Court affirmed the district court decisions on federal question jurisdiction, but remanded with respect to federal officer jurisdiction in light of an intervening en banc decision, *Latiolais v. Huntington Ingalls, Inc.*,[17] which altered our federal officer removal precedent.[18]

On remand, the district court in *Riverwood II*, after considering the impact of *Latiolais*, again held there was no federal officer jurisdiction.  The court first acknowledged that under *Latiolais*, the "new" federal officer removal test requires a defendant to show: "(1) it has asserted a colorable federal defense, (2) it is a 'person' within the meaning of the statute, (3) that has acted pursuant to a federal officer's directions, and (4) the charged

---

[15] *Northcoast*, 2023 WL 2986371, at *2.

[16] *Riverwood I*, 2019 WL 2271118, at *8–22; *Par. of Cameron v. Auster Oil & Gas Inc.*, 420 F. Supp. 3d 532, 540-50 (W.D. La. 2019), *aff'd in part, rev'd in part and remanded sub nom. Plaquemines I*, 7 F.4th 362.

[17] 951 F.3d 286 (5th Cir. 2020) (en banc).  As explained in greater detail below, in *Latiolais*, we expanded the scope of the fourth prong of the federal officer removal test. Specifically, we replaced the "causal nexus" test with the broader "connected or associated with" test.  Under the revised fourth element, a removing defendant must show that the conduct challenged in a plaintiff's complaint is "connected or associated with" acts the defendant has taken under color of federal office.  *Id.* at 292–96.

[18] *Plaquemines I*, 7 F.4th at 373–75.

conduct is connected or associated with an act pursuant to a federal officer's directions."[19]    The court then proceeded to analyze whether the oil companies had met these four prongs, ultimately concluding they could establish all but the third "acting under" prong, which was unaltered by *Latiolais*.[20]

The oil companies again appealed, and this Court affirmed.[21]    In *Plaquemines II*, we held that the companies had failed to satisfy the "acting under" prong of federal officer removal because their "compli[ance] with federal regulations or cooperat[ion] with federal agencies" was insufficient to bring a private action within § 1442(a)(1).[22]    The *Plaquemines II* opinion concluded by stating: "As the district court noted, the 'refineries, who had federal contracts and acted pursuant to those contracts, can likely remove [under § 1442], but that does not extend to [parties] not under that contractual direction."[23]    The Supreme Court denied certiorari in *Plaquemines II* on February 27, 2023.[24]

Following *Plaquemines II*, the district court in *Auster* again remanded that case to state court because the oil companies satisfied neither the "acting

---

[19] *Par. of Plaquemines v. Riverwood Prod. Co.* (*Riverwood II*), No. 18-5217, 2022 WL 101401, at *4 (E.D. La. Jan. 11, 2022) (quoting *Latiolais*, 951 F.3d at 296).

[20] *Id.* at *6–10.

[21] *Plaquemines Par. v. Chevron USA, Inc.* (*Plaquemines II*), No. 22-30055, 2022 WL 9914869, at *4 (5th Cir. Oct. 17, 2022) (per curiam) (unpublished).

[22] *Id.* at *3.

[23] *Id.* at *4 (quoting *Riverwood II*, 2022 WL 101401, at *7).

[24] *Chevron USA, Inc. v. Plaquemines Par., La.*, 143 S. Ct. 991 (2023) (mem.).

No. 23-30294
c/w No. 23-30422

under" nor the "connected or associated with" requirements for federal officer removal.[25]

This background brings us to the present consolidated appeal which involves two cases that were stayed during the pendency of the above litigation. In the appeal from the Eastern District of Louisiana—*Plaquemines Parish v. BP*—the district court reopened the case in January 2023. The next day, Plaintiffs, Plaquemines Parish and the State of Louisiana, filed a motion to remand, arguing that the case was "indistinguishable from the relevant jurisdictional[,] factual[,] and legal issues in *Riverwood*."

Defendants, Chevron U.S.A., Inc. ("Chevron") et al., opposed the motion, arguing that the case was distinguishable from *Riverwood II* because two predecessors to Chevron—The Texas Company and Gulf Oil Company ("Gulf")—were vertically integrated oil companies that produced crude oil in the Operational Areas and used some of that crude at their refineries to comply with their World War II-era contracts with the government. Thus, unlike in *Riverwood II*, *Plaquemines II*, and *Auster*, where the oil companies could not show they were "acting under" a federal officer, Defendants here were federal contractors. In support of their new removal theory, Defendants relied on the language in *Plaquemines II* that "refineries, who had federal contracts and acted pursuant to those contracts, can likely remove [under § 1442]."[26]

The district court granted Plaintiffs' motion and remanded the case to state court for the same reasons it gave in *Parish of Plaquemines v. Northcoast Oil Co.* In *Northcoast*, the district court held that Defendants'

_____

[25] *Par. of Cameron v. Auster Oil & Gas Inc.*, No. 18-677, 2022 WL 17852581, at *3–10 (W.D. La. Dec. 22, 2022).

[26] 2022 WL 9914869, at *4 (quoting *Riverwood II*, 2022 WL 101401, at *7).

No. 23-30294
c/w No. 23-30422

"refinery-contract-based theory" satisfied neither the "acting under" nor the "connected or associated with" requirements for federal officer removal.[27]  Specifically, the court emphasized that although Defendants may have been "acting under" a federal officer in the refinery context, the relevant refinery contracts "lack[ed] any connection" to the oil production activities at issue in the lawsuit.[28]  The court stayed its remand order pending the resolution of this appeal.

The second case in this consolidated appeal—*Parish of Cameron v. BP*—is from the Western District of Louisiana.  In that case, the district court granted Plaintiff Parish of Cameron's motion to remand for the same reasons the court gave in *Auster*.  Defendants, Shell USA, Inc. ("Shell") et al., filed a motion for reconsideration, raising the same refinery-contract-based theory for removal.  In that case, Defendant Shell had refinery contracts with the government during World War II, and its refineries used some of the crude oil Shell produced from the Black Bayou Field in Cameron Parish to fulfill those contracts.  The district court denied Defendants' motion for reconsideration, concluding that Shell was unable to show it was "acting under" a federal officer, and that the oil production activities at issue in the lawsuit were not related to any refinery activities taken pursuant to Shell's federal contracts.  The court also stayed its remand order pending the resolution of this appeal.

Defendants timely appealed both remand orders.  We designated *Plaquemines Parish v. BP* as the lead case among the related "refinery cases" pending before us from the Eastern District.  And we consolidated

---

[27] 2023 WL 2986371, at *4, 9–11.

[28] *Id.* at *9–10.

No. 23-30294
c/w No. 23-30422

*Plaquemines Parish v. BP* with *Parish of Cameron v. BP*,[29] the only refinery case appealed from the Western District.

## II.

"An order remanding a case to state court is 'not generally reviewable.'"[30] However, an order remanding a case under the federal officer removal statute is "reviewable by appeal or otherwise."[31] We review a district court's remand order *de novo*.[32] But we review the "district court's factual determinations made in the process of determining jurisdiction . . . for clear error."[33]

---

[29] After oral argument, Defendants, BP American Production Company ("BP") and Shell, informed the Court that they have reached a settlement with Cameron Parish and therefore withdraw their appeal in *Parish of Cameron v. BP*, No. 23-30422. BP additionally noted that it remained a party in the appeal from the Eastern District of Louisiana, *Plaquemines Parish v. BP*, No. 23-30294. Defendant Chevron also notified the Court that it has not settled nor intends to settle either appeal. Although Defendants' federal officer removal theory in the *Parish of Cameron* appeal is based on Shell's federal contracts, Shell's withdrawal from the appeal does not deprive this Court of jurisdiction. *See Manguno v. Prudential Prop. & Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002) ("To determine whether jurisdiction is present for removal, we consider the claims in the state court petition as they existed at the time of removal." (citation omitted)). Thus, "[o]ur analysis proceeds as if the Federal Officer Defendants had not been dismissed." *Bartel v. Alcoa S.S. Co.*, 805 F.3d 169, 172 n.2 (5th Cir. 2015), *overruled on other grounds by Latiolais*, 951 F.3d 286 ("These Federal Officer Defendants have since been dismissed from the action . . . [and although] the claims against them gave rise to potential removability we now consider, our analysis is unaffected by the dismissals.").

[30] *Plaquemines I*, 7 F.4th at 367 (quoting *Latiolais*, 951 F.3d at 290).

[31] 28 U.S.C. § 1447(d).

[32] *Latiolais*, 951 F.3d at 290 (citation omitted).

[33] *U.S. Fire Ins. Co. v. Villegas*, 242 F.3d 279, 283 (5th Cir. 2001) (citation omitted).

No. 23-30294
c/w No. 23-30422

Unlike other removal doctrines, "federal officer removal is not narrow or limited."[34] However, it remains the removing party's burden to establish federal jurisdiction exists.[35] And if the removing party establishes that one claim satisfies the requirements under § 1442(a)(1), the entire case is deemed removable.[36]

## III.

Defendants removed these cases under § 1442(a)(1), which provides federal jurisdiction over state court actions filed against "any officer (or any person acting under that officer) of the United States or of an agency thereof, in an official or individual capacity, for or relating to any act under color of such office."[37] The statute's "basic purpose" is to protect the federal government from interference with its operations that would ensue if a state were able to arrest federal officers or agents acting within the scope of their authority and bring them to trial in state court on state-law charges.[38]

---

[34] *Butler v. Coast Elec. Power Ass'n*, 926 F.3d 190, 195 (5th Cir. 2019) (internal quotation marks and citation omitted); *see also Williams v. Lockheed Martin Corp.*, 990 F.3d 852, 859 (5th Cir. 2021) ("[T]he federal officer removal statute is to be broadly construed in favor of a federal forum." (internal quotation marks and citation omitted)).

[35] *Butler*, 926 F.3d at 195.

[36] *Morgan v. Huntington Ingalls, Inc.*, 879 F.3d 602, 606 (5th Cir. 2018).

[37] 28 U.S.C. § 1442(a)(1).

[38] *Watson v. Philip Morris Cos.*, 551 U.S. 142, 150 (2007) (internal quotation marks and citation omitted); *see also Glenn v. Tyson Foods, Inc.*, 40 F.4th 230, 232 (5th Cir. 2022) ("While the scope of federal officer removal has broadened, its purpose remains the same: to give those who carry out federal policy a more favorable forum than they might find in state court." (citation omitted)); Elizabeth M. Johnson, *Removal of Suits Against Federal Officers: Does the Malfeasant Mailman Merit a Federal Forum?*, 88 COLUM. L. REV. 1098, 1098–99 (1988) ("Congress enacted these statutes in response to conflicts between states and the federal government to protect officers carrying out controversial federal policies.").

No. 23-30294
c/w No. 23-30422

In order to remove a case under § 1442(a)(1), a private defendant must show that: "(1) it has asserted a colorable federal defense, (2) it is a 'person' within the meaning of the statute, (3) that has acted pursuant to a federal officer's directions, and (4) the charged conduct is connected or associated with an act pursuant to a federal officer's directions." [39] Here, Plaintiffs do not dispute that Defendants are "person[s]" within the meaning of § 1442(a)(1) and therefore satisfy the second requirement for removal. [40] Instead, Plaintiffs argue that Defendants are unable to meet the remaining three elements. Because the district courts held that Defendants failed to establish the third and fourth elements, we begin our analysis with these two elements.

## A.

Private persons, including corporations, may invoke the federal officer removal statute only if they were "acting under" a federal officer or agency. The phrase "acting under" describes "the triggering relationship between a private entity and a federal officer." [41] In describing the "acting under" inquiry, the Supreme Court in *Watson* acknowledged that it is a "broad" phrase that must be "liberally construed," but is "not limitless." [42]

In cases involving a private party, the "acting under" relationship "must involve an effort to *assist*, or to help *carry out*, the duties or tasks of the federal superior." [43] And although a removing defendant "need not show that

---

[39] *Latiolais*, 951 F.3d at 296.

[40] *See Butler*, 926 F.3d at 201 (acknowledging that "the removal statute applies to private persons and corporate entities" (citations omitted)).

[41] *Watson*, 551 U.S. at 149.

[42] *Id.* at 147 (internal quotation marks and citations omitted).

[43] *Id.* at 152 (emphasis in original) (citation omitted).

No. 23-30294
c/w No. 23-30422

its alleged conduct was precisely dictated by a federal officer's directive," it must show that a federal officer exerted "a sufficient level of subjection, guidance, or control over the private actor."[44]   However, "the help or assistance necessary to bring a private person within the scope of the statute does *not* include simply *complying* with the law."[45]   This is true "even if the regulation is highly detailed and even if the private firm's activities are highly supervised and monitored."[46]

Here, the district courts held that Defendants could not satisfy the "acting under" requirement.   Both courts concluded that although Defendants may have acted under a federal officer in *refining* petroleum products, they were unable to show they acted under a federal officer in *producing* crude oil.[47]  We disagree.

A private party "working under a federal contract to produce an item the government needed" is the "archetypal case" of a defendant "acting under" a federal officer.[48]  For example, in *Watson*, the Supreme Court cited

---

[44] *St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.* (*St. Charles II*), 990 F.3d 447, 454–55 (5th Cir. 2021) (internal quotation marks and citations omitted).

[45] *Watson*, 551 U.S. at 152 (emphasis in original).

[46] *Id.* at 153.

[47] *Northcoast*, 2023 WL 2986371, at *8–10 (holding that Defendants failed to satisfy the "acting under" prong "by relying on federal directives governing conduct (refining) that is not implicated by the plaintiffs' lawsuit").

[48] *Williams*, 990 F.3d at 859; *see, e.g.*, *Latiolais*, 951 F.3d at 296 (holding that the removing defendant "performed the refurbishment and, allegedly, the installation of asbestos pursuant to directions of the U.S. Navy" and therefore "act[ed] under color of federal office"); *St. Charles Surgical Hosp., L.L.C. v. La. Health Serv. & Indem. Co.* (*St. Charles I*), 935 F.3d 352, 356 (5th Cir. 2019) (analyzing the terms of the defendant's contract with the Office of Personnel Management to conclude that the federal agency "enjoys a strong level of guidance and control over" the defendant); *Bd. of Cnty. Comm'rs of Boulder Cnty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1253 (10th Cir. 2022)

No. 23-30294
c/w No. 23-30422

with approval this Court's decision in *Winters v. Diamond Shamrock Chemical Co.*,[49] wherein we held that Dow Chemical, a federal contractor, was "acting under" a federal officer when it manufactured Agent Orange, a product the government used during the Vietnam War.[50]   Like Dow Chemical, Defendants here were federal contractors that refined a product—100-octane aviation gasoline ("avgas")—that the government needed to fight in World War II.   And like Dow Chemical's contract with the Department of Defense, the terms of Defendants' federal contracts vested the government with control over the size and manufacturing capacity of their refineries.[51] Accordingly, Defendants have shown that they had the necessary relationship with the government to satisfy the "acting under" requirement.

The district courts came to the opposite conclusion by requiring Defendants to show not only that they "act[ed] under" a federal officer, but also that they acted pursuant to federal directives when they engaged in the conduct giving rise to Plaintiffs' suits.   But such a requirement impermissibly conflates the "distinct" "acting under" and "connected or associated with" elements of the federal officer removal test.[52]   Specifically, it is inconsistent

_____

(emphasizing that a contract for "[w]artime production is the paradigmatic example for this special [acting under] relationship").

[49] 149 F.3d 387 (5th Cir. 1998), *overruled on other grounds by Latiolais*, 951 F.3d 286.

[50] *Watson*, 551 U.S. at 153–54 (citing *Winters*, 149 F.3d at 398-99).

[51] *See infra* Part III.B.2; *Winters*, 149 F.3d at 398–99 (detailing the government's control over Dow Chemical's production of Agent Orange).

[52] *See St. Charles II*, 990 F.3d at 454 (emphasizing that although "the 'acting under' and 'connection' elements may often ride in tandem toward the same result, they are distinct"); *see also Betzner v. Boeing Co.*, 910 F.3d 1010, 1015 (7th Cir. 2018) (explaining that the "acting under color of federal authority requirement . . . is distinct from the acting under requirement in the same way a bona fide federal officer could not remove a trespass suit that occurred while he was taking out the garbage" (internal quotation marks and citation omitted)).

No. 23-30294
c/w No. 23-30422

with the fact that "a defendant might be 'acting under' a federal officer, while at the same time the specific conduct at issue may not be 'connected or associated with an act pursuant to the federal officer's directions.'"[53] Thus, the district courts erred in holding that Defendants did not satisfy the "acting under" element because their federal contracts did not pertain to the oil production activities challenged by Plaintiffs' lawsuits.

## B.

Under the fourth element of the federal officer removal test, "[s]ubject to the other requirements of section 1442(a), any civil action that is connected or associated with an act under color of federal office may be removed."[54] In other words, it is not enough for Defendants to have "act[ed] under" a federal officer if those acts were unrelated to the activities challenged in Plaintiffs' complaints.

In 2011, Congress amended the federal officer removal statute to expand the types of cases that can be removed from just cases "for" an act under color of federal office to include cases "for *or relating to*" such actions.[55] Despite the 2011 amendment, this Court continued to require removing defendants to show "that a causal nexus exists between the defendants' actions under color of federal office and the plaintiff's claims."[56] In 2020, the Court's en banc decision in *Latiolais* brought our case law into compliance with the amended statute by abandoning the "causal nexus" test and replacing it with the "connected or associated with" test, which requires

---

[53] *St. Charles II*, 990 F.3d at 454.

[54] *Latiolais*, 951 F.3d at 296.

[55] *Id.* at 291-92 (emphasis added) (quoting 28 U.S.C. § 1442(a)); Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545.

[56] *Latiolais*, 951 F.3d at 291 (quoting *Winters*, 149 F.3d at 398).

a defendant to show that "the charged conduct is connected or associated with an act pursuant to a federal officer's directions."[57] In adopting this new test, we noted that Congress broadened the scope of actions removable under § 1442(a)(1) given that the ordinary meaning of the phrase "relating to" is "a broad one" that normally means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."[58]

Our application of the "connected or associated with" element in *Latiolais* demonstrates the expanded scope of this new test. In *Latiolais*, the plaintiff sued Avondale in state court alleging Avondale had negligently failed to warn him about the hazards of asbestos or provide him with adequate safety equipment during the refurbishment of a naval vessel.[59] Avondale removed the suit to federal court under § 1442(a)(1), asserting that its contracts with the Navy to build and refurbish naval vessels required Avondale to use asbestos for thermal insulation.[60] The district court remanded the case after finding the old "causal nexus" test was not satisfied because there was no evidence that federal officers controlled Avondale's safety practices. After taking the case en banc, we reversed, holding that under the revised fourth element, removal was proper because Latiolais's negligence claims were "connected with" Avondale's "installation of asbestos pursuant to directions of the U.S. Navy."[61]

---

[57] *See id.* at 296 (overruling cases that "erroneously relied on a 'causal nexus' test after Congress amended section 1442(a) to add 'relating to'").

[58] *Id.* at 292 (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)).

[59] *Id.* at 289–90.

[60] *Id.*

[61] *Id.* at 296.

No. 23-30294
c/w No. 23-30422

In this appeal, in order to determine whether Defendants have satisfied the fourth element of federal officer removal under *Latiolais*, we must first identify the conduct challenged in Plaintiffs' complaints and the relevant federal directives in Defendants' refinery contracts. We then turn to the question of whether the relationship between the two is sufficient to meet the "connected or associated with" test.

**1.**

The parties dispute which production activities Plaintiffs challenge in their complaints. As explained above, Plaintiffs assert that SLCRMA's grandfather clause does not excuse Defendants' noncompliance with the state-law permitting scheme because Defendants' oil production activities were not "lawfully commenced or established." In *Plaquemines I*, we identified the following ways in which Plaintiffs' *Rozel* report alleged that Defendants departed from prudent industry practices before 1980: "by dredging canals (instead of building overland roads), by using vertical drilling (instead of directional drilling), by using earthen pits at well heads (instead of steel tanks), by extracting too much oil, and by not building saltwater reinjection wells."[62]

In defining the specific challenged conduct here, Defendants rely on *Plaquemines I*'s summary of the *Rozel* report and, in particular, the statement that they "extracted too much oil." Based on this language, Defendants assert that the gravamen of Plaintiffs' complaints is that they extracted too much oil too quickly during World War II. Plaintiffs take issue with Defendants' (and by extension *Plaquemines I*'s) characterization of the challenged conduct, asserting that neither their complaints nor the *Rozel*

---

[62] *Plaquemines I*, 7 F.4th at 367.

No. 23-30294
c/w No. 23-30422

report say that Defendants extracted crude oil at overly high production rates.

As identified by the district courts, Plaintiffs' complaints, read in conjunction with the *Rozel* report, target Defendants' oil production and exploration practices. Plaintiffs do not simply challenge the rate at which Defendants extracted oil from the Operational Areas. To be sure, Defendants have presented evidence, which we credit at this stage,[63] that adopting one of Plaintiffs' preferred production methods—the use of directional drilling instead of vertical drilling—would have slowed their production rates during World War II. But Defendants sole focus on the use of vertical drilling and related rate-of-production argument leads them to define the challenged conduct too narrowly by ignoring the other production and exploration practices challenged by Plaintiffs, such as the use of dredged canals and earthen pits, the spacing of wells, and the lack of saltwater reinjection wells. Thus, as properly defined, the challenged conduct here pertains to Defendants' exploration and production activities, which indirectly include the rate at which they extracted crude oil.

## 2.

In identifying the relevant federal directives, Defendants have produced several contracts that Shell and two predecessors of Chevron entered into with the Defense Supplies Corporation ("DSC"), a federal agency. As it pertains to Chevron's predecessors, both The Texas Company and Gulf contracted with DSC in 1942 to manufacture 100-octane avgas at

---

[63] *Louisiana v. Sparks*, 978 F.2d 226, 232 (5th Cir. 1992); *see also Cnty. Board of Arlington Cnty., Va. v. Express Scripts Pharmacy, Inc.*, 996 F.3d 243, 256 (4th Cir. 2021) ("Generally, '[w]e credit Defendants' theory of the case when determining whether' there is such a connection or association . . . 'between the act in question and the federal office.'" (citations omitted)).

No. 23-30294
c/w No. 23-30422

their Port Arthur, Texas, refineries. The Texas Company's 1942 contract indicated that its Port Arthur refinery could produce 2,940 barrels of 100-octane avgas per day, but that it was "willing to expand its facilities" to enable production of 6,750 barrels of 100-octane avgas per day. The DSC agreed to loan The Texas Company $5.5 million to finance the expansion of the Port Arthur refinery.

Once the Port Arthur refinery expansion was complete, DSC contracted to "buy and receive" 5,900 barrels per day of 100-octane avgas for one year "in accordance with" the specifications attached to the contract and "any other specifications which by mutual agreement shall be attached as an addendum." DSC also had the option to purchase additional quantities of avgas that The Texas Company had not contracted to sell to other parties. The Texas Company and DSC signed two subsequent contracts modifying the terms of the original contract to account for further expansions to the Port Arthur refinery and its increased refinery capacity.

Similarly, Gulf's 1942 contract acknowledged that its Port Arthur refinery was "currently expanding its facilities," which would increase production to 4,836 or 5,667 barrels per day, depending on the specifications. The contract called for Gulf to further expand its refinery to increase production to 8,739 or 9,969 barrels per day, depending on the specifications. DSC agreed to make advance payments to Gulf, up to $9.825 million, to help finance this expansion. Throughout Gulf's expansion, the contract specified that DSC would purchase increasing "minimum quantit[ies]" of avgas. The contract also set forth the relevant prices, specifications, and minimum quantities for these purchases.

Lastly, Defendant Shell asserts that it entered into at least 120 contracts with the government during World War II. In particular, Shell contracted with DSC in October 1942 to produce 100-octane avgas at its

No. 23-30294
c/w No. 23-30422

Houston and Norco refineries "in accordance with" the specifications attached to the contract. The contract indicated that production at Shell's "Norco, Louisiana refinery comprises aviation alkylate and cumene only, which are normally transported to the Houston, Texas refinery and are blended there with other aviation gasoline components produced at Houston to make said aggregate production of" 9,000 barrels of 100-octane avgas.

The contract required Shell to provide DSC with its "pro rata share of the entire requirements of the United States Government," a term defined in further detail elsewhere in the contract. DSC also contracted for "the option from time to time" to purchase avgas that Shell had not contracted to sell to other parties. In addition to buying the 100-octane avgas "in its finished form," DSC also had the option to take alkylate and/or cumene directly from Shell's Norco refinery. In July 1944, Shell and DSC amended their 1942 contract in light of the Houston and Norco refineries' increase in production capacity to 12,000 barrels per day of avgas.

At oral argument, Defendants asserted that we are not limited to the above refinery contracts in identifying the relevant federal directives for purposes of determining whether they were "connected or associated with" the challenged conduct. Oral Arg. at 14:00-15:40. Instead, they contend that in cases involving federal contractors, courts should consider whether the charged conduct is related to actions the contractor took not only pursuant to its federal contract, but also actions taken pursuant to relevant federal regulations or directives. In light of this theory, and in recognition that their refinery contracts are silent as to oil production, Defendants point to various federal regulations, designations, and reports involving oil production in the Operational Areas during World War II.[64] Defendants contend that these

---

[64] For example, Defendants emphasize the fact that the government designated the three fields at issue here as "Critical Fields Essential to the War Program," in part because

20

No. 23-30294
c/w No. 23-30422

extra-contractual government documents provide relevant federal directives in analyzing the "connected or associated with" element and demonstrate that the government was involved in regulating *both* crude oil production and refinement.

As explained above, case law is clear that a private party does not "act[] under" a federal officer by complying with federal regulations, guidance, or expectations.[65] And the problem with Defendants' extra-contractual argument is that they cite no authority for the proposition that simply being a federal contractor transforms a private party's actions in compliance with federal regulations or expectations into action taken under color of federal office for purposes of analyzing the "connected or associated with" element. To the contrary, in cases involving private federal contractors, courts look to the contents of the relevant federal contracts in determining whether the challenged conduct was "connected or associated with" acts taken under color of federal office.[66] Moreover, even if we

---

they produced crude oil that was particularly suited for making avgas and other products of high value to the war. Defendants rely on these designations as evidence that the government recognized that oil production in these fields were "connected or associated with" the refinement of avgas for the government and show that the government knew Defendants would use the crude produced in these fields at their refineries.

[65] *See Watson*, 551 U.S. at 153 ("The upshot is that a highly regulated firm cannot find a statutory basis for removal in the fact of federal regulation alone . . . [because] [a] private firm's compliance (or noncompliance) with federal laws, rules, and regulations does not by itself fall within the scope of the statutory phrase 'acting under' a federal 'official.'"); *Plaquemines II*, 2022 WL 9914869, at *3 ([M]erely being subject to federal regulations is not enough to bring a private action within § 1442(a)(1)."); *see also Mohr v. Trustees of Univ. of Pa.*, 93 F.4th 100, 105 (3d Cir. 2024) ("Advancing governmental policy while operating one's own business is not the same as executing a delegated governmental duty.").

[66] *See, e.g., Latiolais*, 951 F.3d at 296 (concluding that the plaintiff's failure-to-warn claims were "connected or associated with" the defendant's installation of asbestos, which was required under the terms of its contract with the U.S. Navy); *Cnty. Board of Arlington Cnty.*, 996 F.3d at 256–57 (holding that the plaintiff's claim that pharmacies caused a public

No. 23-30294
c/w No. 23-30422

considered Defendants' extra-contractual sources, Defendants are unable to connect the government's minimal regulation of crude oil production during World War II to their federal contracts for increased quantities of refined avgas.[67]  We therefore limit our analysis under the "connected or associated with" element to directives in Defendants' federal refining contracts.

**3.**

Having identified the relevant challenged conduct and federal directives, we now evaluate whether the relationship between the two is sufficient for purposes of the "connected or associated with" element of the federal officer removal test.  The district courts held that Defendants were

---

nuisance by filling certain opioid prescriptions was "connected or associated with" the pharmacies' contracts with the Department of Defense ("DOD") because the pharmacies "were required to fill those prescriptions to comply with their duties under the DOD contract").

[67] To the extent Defendants point to certain government designations or reports as evidence that the government "recognized" that Defendants would use the crude produced in the Operational Areas at their refineries, such documents, without any federal mandate, are insufficient to show that Defendants' production practices were connected to a government directive.  *See Mitchell v. Advanced HCS, L.L.C.*, 28 F.4th 580, 590 (5th Cir. 2022) (holding that agency documents consisting of the government's "aspirations and expectations," or "permissive guidance," without any mandates, are "insufficient to establish the kind of relationship necessary to invoke the [federal officer removal] statute"); *In re Methyl Tertiary Butyl Ether ("MTBE") Prod. Liab. Litig.*, 488 F.3d 112, 129–30 (2d Cir. 2007) (holding that even if Congress and the Environmental Protection Agency expected defendants to use MTBE, defendants were unable to show they were "acting under federal officers when they added MTBE, and not some approved alternative, to their reformulated gasoline"); *Riverwood I*, 2019 WL 2271118, at *17 n.44 ("The defendants point to no mandate that the federal government ordered the oil and gas companies to drill and produce these operational areas that would otherwise not have been developed but for the wartime directives.").

No. 23-30294
c/w No. 23-30422

unable to satisfy this element given the lack of connection between their oil production and refining activities.  In *Northcoast*, the court explained that:

> [T]he Removing Defendants fail to point to a single directive in the Gulf contract that touched upon its upstream oil production activities in Louisiana or anywhere else for that matter.  No directive in the contract has anything to do with upstream oil production.  In fact, the contract does not mention where the Port Arthur refinery was to get the large amounts of crude oil that would be necessary to feed the refinery although part (d) of the Price Escalation section does allude to the possibility that Gulf may at times purchase refining components from other suppliers . . . . The contract is simply not concerned with where or how Gulf would obtain the crude oil necessary to produce the fuel that was to be sold to the government at the Port Arthur refinery.  While anyone can infer that performance under the contract would require a lot of crude, the contract is utterly silent as [to] where the crude oil was to come from.  The contract did not direct, require, or even suggest that Gulf produce its own crude in order to meet its contractual obligations.[68]

The district court in *Parish of Cameron* adopted this analysis from *Northcoast*.[69]

---

[68] *Northcoast*, 2023 WL 2986371, *10.

[69] In addition to *Northcoast* and *Parish of Cameron*, at least three additional district court judges have ruled the same way in related refinery cases.  Notably, in these additional rulings, the courts assumed without deciding that defendants could satisfy the "acting under" prong in light of their federal contracts, but concluded that the defendants' production activities were not sufficiently "connected or associated with" the federal directives in their refinery contracts for purposes of the fourth prong.  *See, e.g., Par. of Jefferson v. Destin Operating Co.*, No. 18-5206, 2023 WL 2772023, at *2 (E.D. La. Apr. 4, 2023) (Fallon, J.) ("Accordingly, the Court will proceed to examine prong four, since this prong presents the highest hurdle considering the facts in this case: is the conduct charged here connected or associated with an act pursuant to those directions?"); *Par. of Plaquemines v. Rozel Operating Co.*, No. 18-5189, 2023 WL 3336640, at *4 n.48 (E.D. La. May 10, 2023) (Morgan, J.) ("Because the Court finds the removing Defendants have

No. 23-30294
c/w No. 23-30422

On appeal, Defendants contend the district courts' holdings are inconsistent with *Latiolais*'s expanded "connected or associated with" test, and that they easily satisfy this fourth element. Defendants' overarching argument is that as vertically-integrated companies they produced crude oil in the relevant Operational Areas—Black Bayou Field in Cameron Parish and Duck Club Field and Grand Bay Field in Plaquemines Parish—and used some of that crude at their refineries to manufacture petroleum products in fulfillment of their federal contracts. They additionally contend that if they had adopted Plaintiffs' preferred practice of directional drilling, it would have slowed their production rates, which in turn, would have hampered their ability to fulfill their refinery contracts which called for ever-increasing amounts of avgas. Defendants thus conclude that there is a "close and direct link . . . between the federal contracts for massively increased quantities of refined petroleum war products and the production of correspondingly enormous quantities of crude oil."

Defendants' federal contracts clearly pertain to their refinement of avgas and other petroleum products. But that is not to say that these refinery activities do not have some relation to oil production. This is of course because crude oil is a necessary component of avgas, and one way of obtaining

---

failed to establish the [fourth] element, the Court need not address the other elements. However, for the sake of argument, . . . the Court will assume, without holding, that the Removing Defendants established the [third] element—that they acted under a federal officer's directive because they contracted with the government to refine crude oil."); *Jefferson Par. v. Chevron U.S.A. Holdings, Inc.*, Nos. 18-5224, 18-5213, 18-5218, 18-5220, 18-5230, 18-5252, 18-5260, 2023 WL 8622173, at *6 (E.D. La. Dec. 13, 2023) (Lemelle, J.) ("However, even assuming *arguendo* that the acting-under prong can be established, removing defendants fail to show their complained-of conduct in oil production has anything more than an attenuated connection to their actions under the direction of a federal officer.").

No. 23-30294
c/w No. 23-30422

crude oil is to produce it.[70]  However, we agree with the district courts that in these cases the relationship between Defendants' oil production and refinement activities was insufficient to satisfy the fourth element of federal officer removal.

Although Defendants need not show that a federal officer directed the specific oil production activities being challenged,[71] they still must show these activities had a sufficient connection with directives in their federal refinery contracts.  Defendants fall short of meeting this requirement because, as emphasized by the district court, the contracts gave Defendants "complete latitude . . . to forego producing any crude and instead to buy it on the open market."[72]

The lack of *any* contractual provision pertaining to oil production or directing Defendants to use only oil they produced is what distinguishes

---

[70] The dissent relies on the fact that crude oil is a necessary component of avgas to support its contention that increased crude oil production is "connected or associated with" Defendants' contractual obligations to produce large quantities of avgas.  To drive home this point, the dissent posits that even though Defendants' contracts did not include provisions regarding human labor to run their refineries, the hypothetical necessity of 250 additional laborers in the refinery to produce avgas would clearly be "connected or associated with" Defendants' refinery contracts.  *Post*, at 39 (Oldham, J., dissenting).  We agree.  Hiring sufficient refinery employees to work at federally contracted refineries is clearly "connected or associated with" Defendants' contractual obligations to refine avgas.  But would the same be true as to Defendants' decisions to hire employees to search for new oil reserves?  Or employees to extract crude oil?  (Assuming, of course, that these employees find or extract crude oil that is ultimately refined into avgas by Defendants' federally contracted refineries).  These are more analogous examples to the question presented in the instant cases and are illustrative of the reach of an unduly expansive reading of the "connected or associated with" element.

[71] *See St. Charles II*, 990 F.3d at 454 ("[A] removing defendant need not show that its alleged conduct was precisely dictated by a federal officer's directive.").

[72] *Northcoast*, 2023 WL 2986371, at *10.

No. 23-30294
c/w No. 23-30422

these cases from *Latiolais*.[73]  In *Latiolais*, there was a direct connection between Avondale's lack of safety practices for *asbestos* installation and the requirement in its federal contract to use *asbestos*.[74]  The same is not true here.  Under Defendants' theory, their alleged failure to use prudent industry practices in extracting crude oil is connected to their increased need for crude oil, which in turn is connected to their contractual obligations to furnish the government with large amounts of 100-octane avgas because crude oil is a necessary component of avgas.  But, as explained below, even that attenuated connection was severed by Defendants' lack of control over where their crude oil was refined and by their use of crude oil purchased on the open market from other producers to comply with their contractual obligations.  Thus, unlike *Latiolais*, or even *Morales*,[75] the instant cases require various intermediary (and ultimately severed) links to connect the federal directives and challenged conduct.

The dissent arrives at the opposite conclusion—that this case "fits neatly" within *Latiolais*'s holding.[76]  In support of this conclusion, the dissent suggests that the omission of safety instructions for handling asbestos in *Latiolais*'s contract is equivalent to the omission of instructions for gathering crude oil in the contracts at issue here.  But, as discussed above,

---

[73] *See Rozel Operating Co.*, 2023 WL 3336640, at *5 ("Clearly at odds with Defendants' interpretation of *Latiolais* is the fact that, in *Latiolais*, the charged conduct was still related to a federal officer's directive to use asbestos . . . ,[whereas] [n]owhere in any contract pointed to by the removing Defendants did a federal officer direct the oil production activities of Defendants.").

[74] *Latiolais*, 951 F.3d at 289, 297 (recognizing that "the Navy required installation of asbestos on the *Tappahannock*").

[75] *Morales*, 504 U.S. at 388 (holding that guidelines on airfare advertising were "related to" the rates, routes, or services of an air carrier given that every guideline makes "express reference to [air]fares").

[76] *Post*, at 42 (Oldham, J., dissenting).

No. 23-30294
c/w No. 23-30422

such a comparison overlooks the fact that Avondale's federal contract required the use of asbestos, whereas the federal contracts here did not address crude oil production at all, let alone require Defendants to produce their own crude oil. Thus, the connection between Avondale's alleged lack of safety instructions regarding the installation of asbestos and the requirement in its federal contract to install asbestos is much closer than the tenuous connection between the oil production and exploration practices challenged here and Defendants' refinery contracts. These refinery cases would be more analogous to *Latiolais* if, for example, Defendants' federal contracts required them to produce their own crude oil but were silent as to the production practices challenged by Plaintiffs. Alternatively, *Latiolais* would be closer to these cases if Avondale's federal contract required it to refurbish ships with thermal insulation but did not specify what type of material should be used for insulation.

Consequently, and contrary to the dissent's position, permitting removal here would expand the current limits of the "connected or associated with" element as applied in *Latiolais* and its progeny.[77] And

---

[77] *See, e.g., Williams*, 990 F.3d at 859–60 (relying on Third Circuit caselaw consistent with *Latiolais* to hold that the plaintiff's asbestos-related claims for strict liability and failure to warn were "direct[ly] connect[ed]" to the government's "detailed material, design, and performance specifications for the fuel tanks" and the government's "controlled written materials and markings accompanying the fuel tanks, including all warnings and health-related safeguards associated with them"); *Cloyd v. KBR, Inc.*, No. 21-20676, 2022 WL 4104029, at *1–3 (5th Cir. Sept. 8, 2022) (per curiam) (unpublished) (holding that the military contractors' claims that the defendant failed to implement adequate security measures and provide a safe place to work were connected with the defendant's actions under color of federal office in light of the evidence that the United States military directed and controlled the base and "retained authority over all force protection measures for individuals on base, decided what security protocols to implement, [and] dictated when contractors should take shelter"); *Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.*, No. 22-10414, 2023 WL 2573914, at *4 (5th Cir. Mar. 20, 2023) (per curiam) (unpublished) (concluding that the conduct challenged by the plaintiff was

No. 23-30294
c/w No. 23-30422

although we are mindful of the broad nature of the statute's "relating to" language, as the Supreme Court has cautioned, even "broad language is not limitless."[78]  We acknowledge that reasonable minds can differ on where to draw the line between related and unrelated conduct under governing circuit precedent.[79]  However, we ultimately conclude that these cases fall on the unrelated side of the line given the lack of any reference, let alone direction, pertaining to crude oil production in Defendants' federal contracts.  To hold otherwise would permit a federal contractor with a non-frivolous federal defense to invoke federal jurisdiction under § 1442(a)(1) for conduct only "remote[ly]" or "tenuous[ly]"[80] related to its federal contracts and thereby impermissibly expand the scope of federal officer removal under our existing precedent.

Perhaps recognizing that removal here would be an expansion of existing precedent, Defendants assert, citing to *Latiolais*, that the colorable federal defense requirement will have a narrowing effect and weed out cases that would otherwise pass their near limitless interpretation of the "connected or associated with" element.[81]  Oral Arg. at 11:30-12:04.

---

"directly tied" to actions the defendants took under color of federal office because defendant "made this decision based on its determination that [plaintiff's] claims were not eligible for full reimbursement under the Medicare Act").

[78] *See Watson*, 551 U.S. at 147, 153 (cautioning against a "determination [that] would expand the scope of the [federal officer removal] statute considerably, potentially bringing within its scope state-court actions filed against private firms in many highly regulated industries").

[79] *See Plaquemines Par. v. Chevron USA, Inc.*, 84 F.4th 362, 366 (5th Cir. 2023) (acknowledging that "*Latiolais* left unclear where to draw the line between related and unrelated activities").

[80] *Morales*, 504 U.S. at 390 (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

[81] *See Latiolais*, 951 F.3d at 296 (explaining that although the 2011 amendment expanded the fourth element of federal officer removal, "the statute's requirement that a

No. 23-30294
c/w No. 23-30422

Although *Latiolais* acknowledged that the colorable federal defense requirement may prevent the removal of cases that would otherwise satisfy the expanded "relating to" language, this Court nonetheless still required a removing defendant to show that the charged conduct was "connected or associated with an act pursuant to a federal officer's directions."[82] Thus, we do not read *Latiolais* as permitting courts to stretch the "relating to" requirement to permit the removal of cases where the defendant engaged in the challenged conduct on its own initiative in fulfillment of a tangentially related federal directive.[83] To do so would be to ignore the statute's "language, context, history, and purposes."[84] Specifically, it would read out of the statute the requirement that only civil actions "for or relating to" acts taken under color of federal office are removable.[85] This is particularly true given that Defendants contend that the colorable federal defense requirement is "not limited to defenses premised on the asserted federal direction" and can include defenses that do "not relate to the official acts that gave rise to 'acting under' status."

---

removing party assert a colorable federal defense remains a constitutional, viable, and significant limitation on removability" (citations omitted)).

[82] *Id.*

[83] *See Engelhoff v. Engelhoff ex rel. Breiner*, 532 U.S. 141, 146–47 (2001) (noting in the context of ERISA pre-emption the phrases "relate to" and "connection with" are "clearly expansive," but should not be applied with "uncritical literalism" that would "turn on 'infinite connections.'" (citations omitted)); *Glenn*, 40 F.4th at 232 (recognizing that the basic purpose of the federal officer removal statute is "to give those who carry out *federal policy* a more favorable forum" (emphasis added) (citation omitted)).

[84] *Watson*, 551 U.S. at 147, 151–53. Although *Watson* addressed the limits of the "acting under" element, we find its method of analysis—looking to § 1442(a)(1)'s "language, context, history, and purpose"—to be just as relevant to analyzing the limits of the "connected or associated with" element. *Id.* at 147–53.

[85] 28 U.S.C. § 1442(a)(1).

No. 23-30294
c/w No. 23-30422

\*    \*    \*

Despite the lack of direction in their refinery contracts, Defendants contend that their ability to satisfy their federal refinery obligations was nonetheless related to their oil production practices because they were "vertically integrated" companies that both produced and refined crude oil. Specifically, Defendants assert that "when the government contracts with a vertically integrated refiner/producer, like [Defendants], the crude production used to fulfill the contract for refined avgas plainly relates to that contract."

We find Defendants' reliance on their statuses as vertically-integrated companies to be misplaced. As noted by one district court, Defendants' oil production and refining sectors were "two entirely separate operations requiring different skills, and different operations at different locations."[86] Moreover, the record here shows that a federal agency, the Petroleum Administration for War ("PAW"), established a crude allocation program that controlled the distribution and transportation of produced crude oil from the fields to specific refineries based on various factors that would maximize the output of war products. In allocating the crude oil, the PAW considered neither the practices of the producer nor whether the company that produced the crude had an affiliated refinery.

The PAW's allocation program severed any connection between Defendants' production and refinement activities because Defendants could not control whether they refined their own crude. Instead, they were in the same position as companies that did not produce crude oil but had refineries

---

[86] *Par. of Jefferson v. Destin Operating Co.*, 2023 WL 2772023, at *3; *Northcoast*, 2023 WL 2986371, at *7 ("The separate functions [of upstream oil production and downstream refining operations] may be performed by different companies or a larger company may do both, as Gulf Oil was doing during World War II.").

No. 23-30294
c/w No. 23-30422

with federal contracts. At base, whether or not Defendants happened to refine their own crude oil in fulfilling their federal contracts had nothing to do with any actions they took pursuant to a federal directive. Instead, it depended on "happenstance or logistical preference."[87] Particularly illustrative of this point is the outcome in *Plaquemines II*, in which one defendant, Humble Oil, was a vertically-integrated oil company that produced oil in the Operational Area and had a refinery under federal contract to refine avgas.[88] However, Humble Oil did not rely on its federal refinery contract in seeking removal due to the fact that none of the crude oil it produced in the relevant Operational Area was sent to its refinery.[89] Crucially, this means that the only difference between Humble Oil and Defendants here is that the PAW allocated to Defendants' refineries some of the crude oil they produced in the Operational Areas.[90] To permit removal here, but not in *Plaquemines II*, would lead to illogical and disparate results inconsistent with the overall purpose of the federal officer removal statute.[91]

---

[87] *Jefferson Par. v. Chevron*, 2023 WL 8622173, at *6.

[88] *Riverwood II*, 2022 WL 101401, at *7 & n.14.

[89] *Northcoast*, 2023 WL 2986371, at *6.

[90] *Id.* at *7. The dissent's assertion that the relevant difference is instead that Defendants here relied on their own refining contracts for removal overlooks the fact that Humble Oil could not rely on its own contracts *because* it did not refine the crude oil it produced in the Operational Area. *Post*, at 47 n.4 (Oldham, J., dissenting). Put differently, Humble Oil could not rely on its contracts to satisfy the "connected or associated with" test because none of the crude oil it produced in the relevant field, which was the basis of the plaintiffs' challenged conduct, was allocated to its federally contracted refinery by the PAW. Defendants here acknowledge this is the relevant difference, explaining that "[i]n contrast to the removing defendants in *Plaquemines II*, Defendants here did have government contracts under which they produced avgas and other war products using the oil they produced in the field at issue during WWII."

[91] *See Watson*, 551 U.S. at 152 ("When a company subject to a regulatory order (even a highly complex order) complies with the order, it does not ordinarily create a significant risk of state-court 'prejudice' . . . . Nor is a state-court lawsuit brought against

No. 23-30294
c/w No. 23-30422

Finally, Defendants make the conclusory assertion that had they adopted Plaintiffs' preferred extraction practices, it would have "hampered" their ability to fulfill their federal contracts. But Defendants point to no evidence, aside from their statuses as vertically-integrated companies that needed to refine increased quantities of avgas, to support this assertion. Although Defendants' conclusory assertion might be enough on its own if the only crude oil they refined was their own, the record does not support such a finding. Instead, the evidence makes clear that not only did Defendants lack control over whether they refined their own crude oil, but that their refineries regularly relied on crude oil produced by other companies to fulfill their federal avgas contracts.[92] In sum, although Defendants' refining contracts indirectly required increased amounts of crude oil, that fact alone, absent some federal directive pertaining to Defendants' oil production activities, is insufficient to satisfy the "connected or associated with" element of federal officer removal.

Because Defendants do not satisfy the "connected or associated with" element of federal officer removal, we do not address whether they have asserted a colorable federal defense. Accordingly, we affirm the district courts' holdings that Defendants have not established federal officer removal

---

such a company likely to disable federal officials from taking necessary action designed to enforce federal law." (internal citations omitted)).

[92] For example, the record shows that the PAW sent crude produced by Defendants in the Operational Areas to other companies' refineries. Moreover, it also shows that Defendants during this time period purchased crude oil on the open market from other oil producers for use in their own refineries. As indicative of this fact, Plaintiffs emphasize that in only four of the thirteen SLCRMA cases pending against Defendant Shell did Shell refine its own crude oil produced in the relevant Operational Area in fulfillment of its federal contracts. In the other nine cases, Shell—the same vertically-integrated company that had federal contracts that required it to produce increased quantities of refined avgas—was able to satisfy its federal contracts without using its own crude produced in the Operational Areas.

No. 23-30294
c/w No. 23-30422

jurisdiction on the grounds that they are unable to show that Plaintiffs' claims against them are "connected or associated with" actions they carried out pursuant to a federal directive.

## IV.

For the foregoing reasons, we AFFIRM the district courts' orders remanding these cases to state court.

No. 23-30294
c/w No. 23-30422

Andrew S. Oldham, *Circuit Judge*, dissenting.

I agree with the majority that the defendants "acted under" a federal officer in both producing and refining petroleum during WWII. Unfortunately, our agreement ends there. In my view, the defendants' actions also "relate to" instructions from federal officers. That means this case is removable to federal court.

## I.

"The ordinary meaning of ['relating to'] is a broad one." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). I first (A) discuss the text and history of § 1442(a)(1). Then I (B) discuss the governing precedent. Finally I (C) address the majority's counterarguments, which do not displace the meaning of the statute and our precedent.

## A.

### 1.

Federal officer removal has a long and complicated history. In 1815, Congress enacted the first ancestor of today's federal officer removal statute. In response to New England's opposition to the War of 1812, Congress protected federal interests in collecting customs duties by "insert[ing] into [the relevant] act . . . a provision . . . authorizing removal of all suits . . . against federal officers or other persons as a result of enforcement of the act." Richard H. Fallon, Jr., John F. Manning, Daniel J. Meltzer & David L. Shapiro, Hart and Wechsler's The Federal Courts and The Federal System 853 n.6 (7th ed. 2015) [hereinafter Hart & Wechsler] (citing Act of Feb. 4, 1815, § 8, 3 Stat. 195, 198–99). That act embodied a specialized, limited, and short-term exercise of Congress's power to remove cases arising under federal law to

No. 23-30294
c/w No. 23-30422

federal courts. *See ibid.*; *see also Tennessee v. Davis*, 100 U.S. 257, 267–68, 271 (1880) (discussing the same act and power of Congress to authorize removal).

But over time, Congress repeatedly enacted new federal officer removal statutes, each time extending removal to new classes of defendants. *See* HART & WECHSLER, *supra*, at 853–54 n.6 (listing statutory developments of federal officer removal). In 1833, the "Force Bill" responded to South Carolina's tariff nullification threats in part by broadening federal officer removal to provide federal courts with removal jurisdiction over "any act done under the revenue laws of the United States, or under colour thereof." Act of Mar. 2, 1833, § 3, 4 Stat. 632, 633; *see also Davis*, 100 U.S. at 268 (discussing history of this act). Then, during and immediately following the Civil War, Congress passed a series of removal acts (1) conferring federal jurisdiction over suits for actions authorized by the President or Congress during the War and (2) extending the Force Bill to include *internal* revenue actions. *See* HART & WECHSLER, *supra*, at 853–54 n.6 (first discussing jurisdictional acts for war-time actions, Act of Mar. 3, 1863, § 5, 12 Stat. 755, 756–57, amended by Act of May 11, 1866, §§ 3–4, 14 Stat. 46, 46; Act of Feb. 5, 1867, 14 Stat. 385; Act of July 28, 1866, § 8, 14 Stat. 328, 329–30; Act of July 27, 1868, § 1, 15 Stat. 243, 243; then discussing Force Bill extension, Act of Mar. 7, 1864, § 9, 13 Stat. 14, 17; Act of June 30, 1864, § 50, 13 Stat. 223, 241 (cited as 13 Stat. 218); Act of July 13, 1866, §§ 67–68, 14 Stat. 98, 171–72).

Finally, in 1948, Congress amended the removal statute, "dropping its limitation to the revenue context" and expanding its "coverage to include all federal officers." *Watson v. Philip Morris Cos., Inc.*, 551 U.S. 142, 148–49 (2007); *see also* Act of June 25, 1948, ch. 89, Pub. L. No. 80-773, ch. 646, § 1442, 62 Stat. 869, 938. Thus, "[s]ince 1948, 28 U.S.C. § 1442 has permitted removal of any civil or criminal action against any federal 'officer'

No. 23-30294
c/w No. 23-30422

or 'person acting under the officer' for 'any act under color of such office.'" HART & WECHSLER, *supra*, at 426. That language stood until 2010, when § 1442(a)(1) read:

> A civil action . . . commenced in a State court against any of the following may be removed by them to the district court of the United States . . . : The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity *for any act under color of such office* . . . .

(emphasis added).

According to the Supreme Court, the repeated extension and expansion of federal officer removal evinced a "very basic" congressional desire to protect federal "interest[s] in the enforcement of federal law through federal officials" from interference by state courts or officials. *Willingham v. Morgan*, 395 U.S. 402, 406 (1969); *see also Davis*, 100 U.S. at 263. And the Supreme Court held § 1442(a)(1)'s jurisdiction over suits for any act under "color of [federal] office" required "a 'causal connection' between the charged conduct and asserted official authority." *Willingham*, 395 U.S. at 409 (quoting *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926)).

But in 2011, Congress passed the Removal Clarification Act, Pub. L. No. 112-51, 125 Stat. 545 (2011). In that act, Congress added the phrase "or relating to" to § 1442(a)(1)'s text—broadening § 1442(a)(1)'s coverage from actions "for" an act under color of federal office to actions "for or relating to" such acts. *See id.* at § 2(b), 545 ("Conforming Amendments"). The act sought to clarify "that State courts lack the authority to hold Federal officers criminally or civilly liable for acts performed in the execution of their duties" and to avoid any statutory suggestion that "would potentially subject Federal officers to harassment" by state courts. H.R. REP. NO. 112-17(I), at 1–2 (2011). In doing so, Congress explicitly recognized that the addition of

No. 23-30294
c/w No. 23-30422

"relating to" in § 1442(a)(1) was "intended to broaden the universe of acts that enable Federal officers to remove to Federal court." *Id.* at 6.

So today, 28 U.S.C. § 1442(a)(1) provides:

> A civil action . . . that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States . . . : The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, *for or relating to any act under color of such office* . . . .

(emphasis added).

The new language makes the federal officer removal statute significantly broader than its pre-2011 counterpart. The key phrase, "relating to," ordinarily means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales*, 504 U.S. at 383 (quoting BLACK'S LAW DICTIONARY 1158 (5th ed. 1979)). How are we supposed to understand a phrase that broad? By looking to the statutory "context" to understand its "broad and indeterminate" reach. *Mellouli v. Lynch*, 575 U.S. 798, 811–12 (2015) (quotations omitted). And here, the statutory context is a story nearly as old as our Nation in which Congress relaxed, relaxed, and relaxed again the limits on federal officer removal.

2.

Enter this dispute. Defendants Shell and Chevron executed a series of contracts with the federal Defense Supplies Corporation during World War II. Through those contracts, defendants helped to supply unprecedented volumes of high-octane aviation gasoline ("avgas") to support our Nation's

No. 23-30294
c/w No. 23-30422

war effort. *See, e.g.*, ROA.23-30422.7868 (noting "a 1,185% increase in domestic 100-octane avgas production").

Those contracts were exceedingly broad and demanding. Some of them provided for dramatic expansion of the companies' refineries; some required multiple expansions. And in some contracts, the Government asserted the right to take not only the defendants' finished avgas but also their raw materials. Still more, and perhaps most importantly, some contracts allowed the Government to unilaterally demand more avgas than originally specified, even requiring the refineries operate at full capacity to meet the new demand.

Here, the charged conduct[1]—defendants' petroleum exploration and production activities—clearly "relat[ed] to" an "act under color of [federal] office"—the contractually specified refining activities. The contracts required defendants to produce certain amounts of avgas, which varied across refinery, company, and contract. *See ante*, 18–20 (describing the specific requirements of each contract). But defendants could not simply snap their fingers and, voilà, make avgas. They had to make it out of *something*, and that something was crude oil. (Even the majority concedes this point, noting that "Defendants' refining contracts indirectly required increased amounts of crude oil . . . ." *Ante*, at 32.) So defendants satisfied their contractual avgas obligations by increasing their own exploration and production of crude. The exploration/production of crude was therefore undeniably "related to" the avgas refining contracts.

---

[1] The majority notes that the parties dispute the exact parameters of the "charged conduct." *See ante*, at 17–18. But even accepting the majority's characterization of the conduct, all the conduct still clearly "relates to" the refining contracts.

No. 23-30294
c/w No. 23-30422

True, the contracts did not specify where or how defendants should acquire the massive amounts of crude oil needed to fulfill their avgas obligations. *See ante*, at 25–26. Nor, I suppose, did the contracts specify where or how the defendants would acquire additional human labor to increase output at their refineries. But there can be no doubt that human labor, like crude oil, is an indispensable, necessary, and direct step to producing avgas. If the defendants were contractually obligated to produce, say, one million barrels of avgas, and to do that they needed 250 additional human laborers to work in the refineries, we would obviously say the human labor is "related to" the refining contracts. And defendants' hiring practices to acquire the necessary, additional labor would likewise be "related to" the refining contracts. Without those practices, defendants could not meet their contractual obligations—hence underscoring the connectedness of the labor inputs and the avgas outputs. So too with crude oil, in my view.

To give a sense of scale, defendants point out that a combination of federal regulation and end-product contracts required U.S. oil and gas companies "to increase oil production *by more than 44,000,000 gallons a day.*" *Cameron* (23-30422) Blue Br. at 11 (emphasis in original); *Plaquemines* (23-30294) Blue Br. at 11; ROA.23-30422.8295–96. Without that increase, it is unclear how defendants could have met their contractual obligations with the federal Government. And given their contractual obligations to produce avgas, defendants had to get the crude oil from *somewhere*, and *someone* had to figure out how to get 44 million extra gallons of crude oil out of the ground *every day*. Thus, defendants' increased exploration and crude-production efforts were "related to" their avgas contracts. In my view, that makes this case removable under § 1442(a)(1).

No. 23-30294
c/w No. 23-30422

B.

If the plain language of § 1442 were not enough, our most recent en banc decision on the question should be. *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc).

1.

In *Latiolais*, this court gave "relating to" its "ordinary meaning" and held civil actions "relat[e] to" acts under federal direction as long as "the charged conduct is *connected or associated* with an act pursuant to a federal officer's directions." 951 F.3d at 292, 296 (emphasis added); *see also Morales*, 504 U.S. at 383 (defining "relating to" in part as "to bring into association with or connection with"). Like the phrase "relating to," the phrase "connected or associated with" captures a broad range of conduct. *See Maracich v. Spears*, 570 U.S. 48, 59–60 (2013) (interpreting "in connection with"). And for good reason: *Latiolais* adopted its connected-or-associated test because Congress substantially broadened § 1442 in the 2011 amendment. *See* 951 F.3d at 290 ("Over time . . . Congress has broadened the removal statute repeatedly until it reached the coverage [seen in § 1442 today].").

Our pre-*Latiolais* test was narrower. Our old test was called the "direct causal nexus" standard. *Id.* at 291–92. The old test required "a causal nexus . . . between the defendants' actions under color of federal office and the plaintiff's claims." *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 398 (5th Cir. 1998). In other words, "mere federal involvement [did] not satisfy the causal nexus requirement; instead, the defendant [had to] show that its actions *taken pursuant to the government's direction or control* caused the plaintiff's specific injuries." *Savoie v. Huntington Ingalls, Inc.*, 817 F.3d 457, 462 (5th Cir. 2016) (emphasis added) (citing *Bartel v. Alcoa S.S. Co.*, 805 F.3d 169, 172–74 (5th Cir. 2015)). That test afforded the new § 1442 too little

No. 23-30294
c/w No. 23-30422

flexibility. Most importantly, it excluded claims *related to* actions under "the government's direction or control" from removal. *Ibid.*

The practical difference between "direct causal nexus" and "connect[ion] or associat[ion]" is obvious from *Latiolais* itself. There, the defendant contracted with the United States Navy "to build and refurbish naval vessels." *Latiolais*, 951 F.3d at 289. The contracts often required the defendant to use asbestos for the ships' thermal insulation. *Ibid.* The plaintiff, a machinist on one of the refurbished ships, was exposed to asbestos and diagnosed with mesothelioma many years later. *Ibid.* The plaintiff sued the defendant contractor, claiming the contractor "negligently failed to warn him about asbestos hazards and failed to provide adequate safety equipment." *Id.* at 290.

While the contracts required asbestos, they said *nothing* about whether the defendants could or should furnish safety warnings or equipment. *See Latiolais v. Huntington Ingalls, Inc.*, 918 F.3d 406, 407 (5th Cir. 2019), *rev'd en banc*, 951 F.3d 286. We emphasized "there [was] nothing to suggest that the Navy, in its official authority, issued any orders, specifications, or directives relating to safety procedures" *at all*—much less did the contracts say anything at all about safety. *Id.* at 410 (quotation omitted). And there was no evidence that the safety precautions—had the contractor employed them—would have impeded or even affected the contracts' objectives. *See id.* at 411 (concluding that the "failing to warn, train, and adopt safety procedures regarding asbestos . . . were private conduct *that implicated no federal interests.*" (emphasis added) (quotation omitted)).

A panel of this court therefore initially found the plaintiff could not satisfy the old, too-strict "causal nexus requirement." *Id.* at 411. And I suppose that makes sense in a world where § 1442 requires a direct causal connection between the charged conduct and the Government's contracts.

No. 23-30294
c/w No. 23-30422

After all, nothing in the contracts *prohibited* defendants from warning about asbestos or providing safety equipment, and hence nothing in the contracts *caused* the defendants' tortiously negligent safety violations. The defendant contractor alone made those tortious choices in deciding how to fulfill their contractual obligations to furnish asbestos-insulated boats.

But our en banc court reversed and broadened the § 1442 standard to match the statutory text. While the contracts did not prohibit providing, say, safety gear to shipworkers, the defendants' failures to provide safety gear was certainly connected or associated with the asbestos contracts. *Latiolais*, 951 F.3d at 296. Obviously, the underlying facts and the nature of the challenged conduct did not change between our panel decision and our en banc review. But our new test swept more broadly, encompassed more actions, and more appropriately recognized that safety measures for asbestos installation "relate[d] to" the asbestos installation. *Ibid.*

*Latiolais*'s shift therefore highlights that our new test has very real consequences, especially for federal contractors. Without *Latiolais*, those contractors might otherwise face a Catch-22: limit their actions to the bare words of a federal contract and insist that the Government control every action related to that contract, or risk suit in a potentially hostile state court for any associated acts taken to better fulfill that contract. For example, the defendants in this case, I suppose, could have said their avgas contracts make no provision for hiring human laborers, so it was simply impossible for the defendants to meet the Government's wartime demands. But after the 2011 amendment to § 1442 and after our decision in *Latiolais*, government contractors do not face that absurd choice.

2.

This case fits neatly into the *Latiolais* holding. True, as the majority highlights, the contracts here did not specify where and how the defendants

No. 23-30294
c/w No. 23-30422

should find the millions upon millions of gallons of crude oil they needed to make avgas. At most, the contracts "allude to the possibility that [defendants] may at times purchase refining components from other suppliers" but "did not direct, require, or even suggest that [defendants] produce [their] own crude in order to meet [their] contractual obligations." *Parish of Plaquemines v. Northcoast Oil Co.*, 669 F. Supp. 3d 584, 597 (E.D. La. 2023); *see also ante*, at 23 (same). But "direct, require, or . . . suggest" is not the § 1442 standard—as *Latiolais* itself proves. Instead, under *Latiolais*, discretionary decisions need only be "connected or associated with" a federal instruction to warrant removal.

So too here. The majority admits "crude oil is a necessary component of avgas, and one way of obtaining crude oil is to produce it." *Ante*, at 24–25. But in the same way the *Latiolais* contracts were utterly silent as to safety measures, the contracts here omitted instructions for gathering the required component parts of avgas. And in the same way that the *Latiolais* defendants made an independent decision to forgo safety measures to produce their final product, defendants here decided to increase crude production to meet the demand for their final product. That the defendants in either case had "complete latitude" to take associated actions in the process of fulfilling their federal directives in no way severs the connection between those actions and that direction.

If anything, this case is easier than *Latiolais*. When it comes to refurbishing ships with asbestos, you might reasonably imagine two different arguments a contractor could make to justify removal. In the first, the asbestos safety measures would have slowed down the contractor's work on the ships, created undue expense, or otherwise impeded the accomplishment of the federal interest in getting the ships back at sea ASAP. In that hypothetical situation, the decision to forgo safety measures would obviously

relate to the federal directive—indeed, it might even be necessary. Alternatively, the asbestos safety measures might have no bearing whatsoever on the speed, cost, or feasibility of the federal refurbishment directive. In that case, it is much less clear that the safety decisions would properly fall within § 1442's "relating to" prong—and they certainly were *not* necessary to refurbish the ships and get them back in service.

*Latiolais* presented the second scenario. *See* 918 F.3d at 411 (panel opinion). Nonetheless, our en banc court held the safety measures "relate[d] to" the federal contracts. *Latiolais*, 951 F.3d at 296 (en banc). But in this case, we have the first, much easier scenario. Forgoing the challenged crude exploration and production practices would have hampered the federal interest in refined avgas explicitly outlined in the contracts. So if the conduct in *Latiolais* related to the federal directive, so too must the conduct here.

To hold otherwise is to find that discretion destroys the connection between a federal directive and the challenged conduct—just as our old, now-jettisoned causal-nexus test once did. *Latiolais* bars such an interpretation of § 1442 and requires us to find these defendants acted in "connection . . . with" their federal directives.

## C.

Finally, the majority makes several arguments suggesting the connection between crude production and avgas refining is too attenuated to satisfy § 1442(a)(1). With all respect to my learned and esteemed colleagues, I think the majority's arguments miss the mark.

### 1.

First, the majority contends the petroleum production practices during WWII bore only an "attenuated connection" composed of "various intermediary . . . links" to refining avgas. *Ante*, at 26. I do not understand

how this helps the majority because it concedes crude and avgas were "link[ed]." If defendants needed to increase avgas production, they necessarily needed to find more crude. And how they chose to find more crude is necessarily linked and hence necessarily "related to" increasing their avgas production. The majority says, no, the supply chain had two hermetically sealed links: Defendants used certain exploration and production practices because of increased need for crude oil (link one), and there was increased need because of the refining contracts (link two). But even on the majority's telling these supply-chain links are, well, linked. And hence they are connected.

The majority next contends the appropriate single link—the one purportedly more akin to *Latiolais*—would have been if the "federal contracts required [defendants] to produce their own crude oil but were silent as to the production practices challenged by Plaintiffs." *Ante*, at 27. But again, even if the facts *did* reveal "various" links, the majority would under-read *Latiolais*. Requiring that the outcome of the challenged conduct be contractually specified so that "relating to" only encompasses discretionary choices about *how* to accomplish the expressly directed action walks back *Latiolais*'s "connected or associated with" test. Even the facts in *Latiolais* were not that closely "related": The contract specified the use of asbestos, not what safety protocols the contractor would employ. The challenged conduct dealt with shortcomings in those protocols, not the defendant's choice of how to install the asbestos. *See Latiolais*, 918 F.3d at 407 (panel opinion) (describing government contracts and oversight of safety measures). To claim the case before us contains "various intermediary . . . links" is to acknowledge that *Latiolais* itself contained at least two links— apparently one too many in the majority's own § 1442 framework.

No. 23-30294
c/w No. 23-30422

2.

Second, the majority contends that, even if there was an "attenuated connection" between the production practices and refining contracts, *ante*, at 26, the Petroleum Administration for War ("PAW") "severed" the causal chain necessary for § 1442 removal, *ante*, at 30–31.[2] But this contention suffers from similar flaws. Requiring an unsevered causal chain takes us back to the old, now-discarded, pre-*Latiolais* standard and ignores the expansiveness of the new "relating to" language in § 1442. Moreover, there is no reason to think that PAW's control over crude shipments somehow rendered irrelevant the production choices made by defendants and other oil companies. Across all the contracts (Shell, as the majority points out, boasts at least 120 government contracts, *see ante*, at 19), the companies needed a gargantuan volume of crude oil. So, predictably, they engaged in expanded production practices and produced massively increased volumes of crude oil, which the PAW then distributed and directed—for the production of avgas and other refined products. Such Government direction of raw materials does not make the decision to produce those raw materials *unrelated* to the back-end government contracts—contracts also heavily influenced by the same government agency.[3] The direction simply inserts the Government into

---

[2] Relatedly, the majority finds defendants' "oil production and refining sectors were two entirely separate operations requiring different skills, and different operations at different locations." *Ante*, at 30 (quotation omitted). But even if the on-the-ground execution of the production and refining sectors were "entirely separate," that fact has little bearing on the defendants'—vertically-integrated companies with coordinated operations across many inter-related areas—decision-making process *vis-à-vis* their federal contracts.

[3] As defendants explain, "PAW also played an important role in negotiating the contracts with the companies that produced 100-octane avgas. . . . PAW determined 'the price and technical details of avgas production and procurement.'" *Plaquemines* (23-30294)

No. 23-30294
c/w No. 23-30422

another layer of control to ensure oil companies met their production targets (including for avgas). Such interconnectedness cannot possibly show that the oil companies production practices were *not* "connected or associated with" their refining duties.[4]

3.

Finally, I respectfully disagree with the majority that my reading of § 1442 would "expand the current limits" of the *Latiolais* test. *Ante*, at 27. As already discussed, the challenged actions here are akin to the actions in *Latiolais*. And none of the cases the majority cites as *Latiolais*'s "progeny" disprove this. *See ante*, at 27–28 n.77. Rather, each one simply reaffirms the "connected or associated with" test.

The majority cites *Cloyd v. KBR, Inc.* for the principle that the federal Government must have "retained authority" over the relevant decisions by federal contractors. *Ante*, at 27 n.77 (citing No. 21-20676, 2022 WL 4104029, at *1–3 (5th Cir. Sept. 8, 2022)). But *Cloyd* stands for no such proposition. Instead, that case simply restated the *Latiolais* rule, confirming that

---

Blue Br. at 13 (quoting *Exxon Mobil Corp. v. United States*, No. H-10-2386, 2020 WL 5573048, at *11 (S.D. Tex. Sept. 16, 2020)).

[4] The majority also contends that this "severing" places defendants in the same position as the oil producers in *Plaquemines Parish v. Chevron USA, Inc.* (*Plaquemines II*), No. 22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022) (per curiam) (unpublished), leaving the cases distinguishable only by the fact that the producers there did not receive any of their own crude from the PAW allocation, while our defendants did. *Ante*, at 30–31. But what distinguishes the *Plaquemines II* producers from our defendants is not primarily that ours received some of the crude oil they produced. Rather, the distinguishing feature is that the *Plaquemines II* producers failed to rely on their own refining contracts to remove the action against it to federal court. *Plaquemines II*, 2022 WL 9914869, at *4. They instead removed as subcontractors and therefore failed § 1442's "*acting under*" prong. *Id.* at *1, 4. *Plaquemines II* therefore tells us nothing about whether our defendants' actions "related to" their refining contracts.

"causation" was *no longer* the § 1442(a)(1) test. *Cloyd*, 2022 WL 4104029, at *3. Although the facts in *Cloyd did* demonstrate causation between the federally controlled actions and the charged conduct, the panel nonetheless clearly understood that circumstance just made for an easy case. *Id.* at *3. That *Cloyd*'s facts satisfied *Latiolais* and § 1442 does not mean that *only Cloyd*'s facts can satisfy *Latiolais* and § 1442.

The majority then cites *Trinity Home Dialysis, Inc. v. WellMed Networks, Inc.* for the principle that challenged conduct must be "directly tied" to actions under color of federal authority. *Ante*, at 27–28 n.77 (citing No. 22-10414, 2023 WL 2573914, at *4 (5th Cir. Mar. 20, 2023)). But it isn't clear that defendants' crude production activities *were not* "directly tied" to their federal contracts. Indeed, one could consider those activities a direct result of the contractual obligations. And in any event, *Trinity* applied the *Latiolais* test and confirmed that defendants can have discretion or latitude in decision-making while also taking actions that "relate to" the overarching federal direction. 2023 WL 2573914, at *4. There, although WellMed exercised "discretion to determine whether a claim [was] covered," that discretion "ar[ose] from the authority expressly delegated to [WellMed]" and therefore demonstrated only latitude in how the federal directive was carried out, not a lack of connection. *Id.* at *4.

Finally, the majority cites *Williams v. Lockheed Martin Corporation* for the principle that *Latiolais* requires a "direct connection" to Government-controlled specifications. *Ante*, at 27 n.77 (citing 990 F.3d 852, 859–60 (5th Cir. 2021)). But, as the majority correctly notes, *Williams* applied the Third Circuit's § 1442 precedent, not *Latiolais*. 990 F.3d at 858–60. Moreover, the panel there highlighted that federal control over the details of the final product at issue—such as the "material, design, and performance specifications . . . [and] materials and markings accompanying the

[products]"—"demonstrate[d] a direct connection" between the federal direction and any claims related to the final product. *Id.* at 860. Similar here. The federal contracts controlled all details of the final product, high-octane avgas. So claims concerning the materials needed to manufacture that product clearly *relate to* actions under color of federal authority. All told, the majority could *at best* claim these were easier cases under the *Latiolais* test than the case before us today. But none reduces *Latiolais*'s interpretation of "relating to" in § 1442 to the cribbed one adopted by the majority.

## II.

Today, the majority reinstates a version of the old, discarded, causal-nexus test. That approach apparently is driven by the majority's fear that properly embracing the amended text of § 1442 and *Latiolais* would render § 1442 "limitless." *See ante*, at 28. Again, with deepest respect for my esteemed and learned colleagues, I think that fear is misplaced.

For one thing, the majority itself fully explains the limited nature of the "acting under" prong of federal officer removal: § 1442 applies only to defendants engaged in conduct "to assist, or to help carry out, the duties or tasks of the federal superior," not those merely subject to extensive federal regulation, *Watson*, 551 U.S. at 152–53 (emphasis omitted), or those "simply complying with the law," *see ante*, at 13 (emphasis omitted) (quoting *id.* at 152); *see also St. Charles Surgical Hosp., LLC v. La. Health Serv. & Indem. Co. (St. Charles II)*, 990 F.3d 447, 455 (5th Cir. 2021) ("[T]he 'acting under' inquiry . . . requir[es] . . . the federal officer 'exert[] a sufficient level of subjection, guidance, or control' over the private actor." (citation omitted)).

But more importantly, the majority misunderstands the role of § 1442's colorable federal defense prong. Focusing narrowly on the scope of "relating to," the majority instead worries that § 1442(a)(1) would be

No. 23-30294
c/w No. 23-30422

rendered "limitless" without today's narrowing construction. *Ante*, at 28 (citing *Watson*, 551 U.S. at 147, 153).[5]

I first (A) explain why the colorable federal defense prong of the removal test serves to curb the test's expansiveness. Then I (B) discuss one of these defendants' colorable defenses.

## A.

As a preliminary matter, the colorable federal defense requirement does not come from the text of § 1442. Instead, it derives from Article III as a way of meeting "arising under" jurisdiction. *See Mesa v. California*, 489 U.S. 121, 136–37 (1989). Therefore, even if Congress had chosen *not* to limit the removable conduct of federal officers to actions "relating to" official directives, the statute would still be backstopped by Article III's limits.

As a substantive matter, the federal defense requirement is admittedly broad in its own right. But it simply ensures § 1442 "is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law." *Willingham*, 395 U.S. at 406–07. It hinges federal jurisdiction on federal defenses because "[o]ne of the primary purposes of the removal statute . . . was to have such defenses litigated in the federal courts." *Id.* at 407; *see also Mesa*, 489 U.S. at 128 (concluding *Davis*, 100 U.S. 257, "upheld the constitutionality of the federal officer removal

---

[5] Most of the concern about creating a "limitless" removal test seems to derive from *Watson*. *See ante*, at 28 & n.78 (citing *Watson*, 551 U.S. at 147, 153). But *Watson*'s cautionary word about "expand[ing] the scope" of § 1442 predates the 2011 amendment *and*, as is discussed by the majority, that statement concerns the scope of § 1442's "acting under" prong. *See ante*, at 12. Its relevance therefore pales in comparison to other cases' reminders not to saddle § 1442 with "a narrow, grudging interpretation." *See Latiolais*, 951 F.3d at 290 (citing *Willingham*, 395 U.S. at 407; *Arizona v. Manypenny*, 451 U.S. 232, 242 (1981); and *Jefferson Cnty. v. Acker*, 527 U.S. 423, 431, (1999)).

statute precisely because the statute predicated removal on the presence of a federal defense"). And it would thwart that purpose to require "a clearly sustainable defense[:] [t]he suit would be removed only to be dismissed." *Willingham*, 395 U.S. at 407. "Congress certainly meant more than th[at] when it chose the words 'under color of . . . office.' . . . The officer need not win his case before he can have it removed." *Ibid.*

Following that logic, our court has confirmed "an asserted federal defense is colorable unless it is 'immaterial and made solely for the purpose of obtaining jurisdiction' or 'wholly insubstantial and frivolous.'" *Latiolais*, 951 F.3d at 297 (quoting *Zeringue v. Crane Co.*, 846 F.3d 785, 790 (5th Cir. 2017) *overruled in part by Latiolais*, 951 F.3d 286). Because § 1442 "is a pure jurisdictional statute," the removing defendant need only supply a defense that can "serve as the federal question that endues the court with jurisdiction." *Zeringue*, 846 F.3d at 789 (quotation omitted). Thus, in the same way a complaint asserting a federal claim need not prove-up that claim from the outset, so too a defendant asserting a colorable defense for the purposes of § 1442 need not convince us of the merits of that defense. *See id.* at 790.

Given that breadth, one might reasonably wonder whether the colorable-defense requirement "remains a constitutional, viable, and significant limitation on removability." *Latiolais*, 951 F.3d at 296 (citing *Mesa*, 489 U.S. at 136–37; Anthony J. Bellia, Jr., *The Origins of Article III "Arising Under" Jurisdiction*, 57 Duke L.J. 263 (2007)). In my view, it does.

*Mesa* proves it. There, two United States Postal Service mailtruck drivers committed criminal traffic violations while on duty. *Mesa*, 489 U.S. at 123. California charged one driver with "misdemeanor-manslaughter" after she struck and killed a cyclist. *Ibid.* And the state charged the other

driver with "speeding and failure to yield" after he "collided with a police car." *Ibid.* Both drivers were clearly acting in the scope of their federal duties. Both drivers removed to federal court, asserting only that "the state charges arose from an accident involving defendant which occurred while defendant was on duty and acting in the course and scope of her employment with the Postal Service." *Ibid.* (citation omitted). But the Supreme Court held both drivers' cases should be remanded for lack of federal jurisdiction under § 1442 because their petitions failed to raise any "colorable claim of federal immunity or other federal defense." *Id.* at 124. Simply acting as a federal employee was not enough.

*Mesa* thus confirms that even where the other prongs of § 1442 are indisputably met—there could be no serious argument that the mailtruck drivers did not act under federal authority or that the challenged conduct was not precisely the act authorized—the colorable federal defense element still has teeth. Moreover, *Mesa* demonstrates there will be factual situations in which a federal officer or someone acting under a federal officer could be engaged in activities *related to* the federal authority, yet no federal defense will apply. *See Mesa*, 489 U.S. at 136 (discussing the consequences of eliminating the federal defense requirement). The colorable defense element still bears these contours today, and so *Latiolais*'s new test—however expansive it may be—did not render § 1442 "limitless."

## B.

Here, Shell and Chevron assert "immunity, preemption, and due process" as their colorable federal defenses. *Plaquemines* (23-30294) Blue Br. at 48; *Cameron* (23-30422) Blue Br. at 43. Because defendants need only assert one such defense, I discuss only preemption. (This is not to say that the other defenses might not also be colorable.)

No. 23-30294
c/w No. 23-30422

State laws are preempted "where compliance with both federal and state regulations is a physical impossibility . . . ." *Boggs v. Boggs*, 520 U.S. 833, 844 (1997) (citation omitted); *see also* Caleb Nelson, *Preemption*, 86 Va. L. Rev. 225, 228 (2000). The Supreme Court has also said preemption applies "where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Boggs*, 520 U.S. at 844 (citation omitted).

Defendants contend federal regulations preempt the parishes' claims in various ways. To consider just one example, they claim federal regulations during WWII authorizing oil production activities conflict with the parishes' assertion that those same production activities were unlawful.[6] The parishes' claims contest wartime practices highly regulated by the PAW and government contracts. If those practices violated Louisiana law, then it may have been impossible to comply with both the federal directives and Louisiana law. Defendants therefore suggest the state law "is inconsistent with the federal scheme[, it] must give way." *Maryland v. Louisiana*, 451 U.S. 725, 751 (1981); ROA.23-30294.34357; *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963) ("A holding of federal exclusion of state law is inescapable and requires no inquiry into congressional design where compliance with both federal and state regulations is a physical impossibility for one engaged in interstate commerce."). That is clearly enough to raise a colorable federal defense.

---

[6] The majority contends that the federal regulations cannot support the "relating to" analysis because regulations cannot satisfy the "acting under" prong of § 1442. *Ante*, at 21–22 (citing *Watson*, 551 U.S. at 153). However, it does not follow from *Watson* that regulations could not give rise to federal defenses under this separate § 1442 prong.

No. 23-30294
c/w No. 23-30422

\*    \*    \*

During World War II, defendants were tasked with producing vast amounts of avgas for our Nation's war efforts. With our Greatest Generation deployed in harm's way on battlefields and airfields all around the world, defendants increased their crude production so they could meet the Armed Forces' demands for avgas. The defendants' decisions 80 years ago plainly "related to" their avgas contracts and hence satisfy today's federal officer removal statute. With deepest admiration and respect for my colleagues who reach a different conclusion, I would vacate the remand orders and allow this case to proceed where it belongs: in federal court.