# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

————————————

PLAQUEMINES PARISH,

*Plaintiff-Appellee,*

LOUISIANA STATE; LOUISIANA DEPARTMENT OF NATURAL RESOURCES,
OFFICE OF COASTAL MANAGEMENT, THOMAS F. HARRIS, SECRETARY,

*Intervenors-Appellees,*

v.

BP AMERICA PRODUCTION CO., AS SUCCESSOR IN INTEREST TO AMOCO
PRODUCTION CO.; BURLINGTON RESOURCES OIL & GAS CO., L.P. CHEVRON
USA INC., AS SUCCESSOR IN INTEREST TO CHEVRON OIL CO., THE
CALIFORNIA OIL CO. AND GULF OIL CORP.; EXXON MOBIL CORP. AS
SUCCESSOR IN INTEREST TO THE SUPERIOR OIL CO.; SHELL OFFSHORE,
INC.; SHELL OIL CO; CHEVRON U.S.A. HOLDINGS, INC, AS SUCCESSOR IN
INTEREST TO TEXACO E&P INC. AND TEXACO INC.; TEXAS CO; CHEVRON
PIPE LINE CO., AS SUCCESSOR IN INTEREST TO GULF REFINING CO.,

*Defendants-Appellants.*

————————————

On Appeal from the United States District Court
for the Eastern District of Louisiana
No. 2:18-cv-05256

————————————

## *AMICI CURIAE* BRIEF OF
## GENERAL (RETIRED) RICHARD B. MYERS and
## ADMIRAL (RETIRED) MICHAEL G. MULLEN,
## IN SUPPORT OF PETITION FOR
## REHEARING OR REHEARING EN BANC

————————————

COUNSEL LISTED ON INSIDE COVER

Tristan L. Duncan
*Counsel of Record*
SHOOK, HARDY & BACON LLP
2555 Grand Blvd.
Kansas City, MO 64108
(816) 474-6550
tlduncan@shb.com

Cary Silverman
SHOOK, HARDY & BACON LLP
1800 K Street, N.W., Ste. 1000
Washington, DC 20006
(202) 783-8400
csilverman@shb.com

Daniel B. Rogers
SHOOK, HARDY & BACON LLP
201 S. Biscayne Blvd., Ste. 3200
Miami, FL 33131
(305) 358-5171
drogers@shb.com

*Counsel for Amici Curiae*

# SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES

The undersigned counsel of record for *amici curiae* certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1, in addition to those listed in Defendants-Appellants' Certificates of Interested Persons, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

***Amici***: United States Air Force General (Retired) Richard B. Myers and United States Navy Admiral (Retired) Michael G. Mullen.

***Counsel for Amici***: Tristan L. Duncan, Cary Silverman, and Daniel B. Rogers, all of the law firm Shook, Hardy & Bacon L.L.P.

/s/ Tristan L. Duncan
Tristan L. Duncan
Attorney of Record for *amici curiae* United States Air Force General (Retired) Richard B. Myers and United States Navy Admiral (Retired) Michael G. Mullen

i

# TABLE OF CONTENTS

**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PARTIES ............i

INTEREST OF *AMICI CURIAE* ................................................ 1

INTRODUCTION AND SUMMARY OF ARGUMENT .......................... 3

ARGUMENT ................................................................................. 6

I.   DURING WWII, THE FEDERAL GOVERNMENT
     DIRECTED AND CONTROLLED OIL PRODUCTION TO
     WIN THE WAR BY MAXIMIZING DELIVERY OF FUEL ........... 8

II.  DEPRIVING DEFENDANTS-APPELLANTS OF A
     FEDERAL FORUM PRESENTS NATIONAL SECURITY
     RISKS BY INVITING PAROCHIAL SECOND-GUESSING
     OF FEDERAL OFFICERS AND DETERRING PRIVATE
     PARTIES FROM SUPPORTING NATIONAL DEFENSE
     PRIORITIES ......................................................................... 12

CONCLUSION ............................................................................ 14

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT ... 16

CERTIFICATE OF SERVICE ....................................................... 17

ii

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Latiolais v. Huntington Ingalls, Inc.*,
    951 F.3d 286 (5th Cir. 2021)................................................................. 13

*Shell Oil Co. v. United States*,
    751 F.3d 1282 (Fed. Cir. 2014) ............................................................. 8

*Watson v. Philip Morris Cos.*,
    551 U.S. 142 (2007)....................................................................... 4, 13

*Willingham v. Morgan*,
    395 U.S. 402 (1969)....................................................................... 4, 13

**STATUTES**

28 U.S.C. § 1442 ............................................................................. 4

**OTHER AUTHORITIES**

9 Cong. Deb. 461 (1833).............................................................. 4

Office of the Secretary of Defense Public Affairs, *Mullen:
    Military Has 'Strategic Imperative' to Save Resources*,
    Energy Security Forum, Washington, D.C., Oct. 13, 2010,
    https://www.dvidshub.net/news/58040/mullen-military-
    has-strategic-imperative-save-resources.............................................. 2

National Petroleum Council, *A National Oil Policy for the
    United States* (1949) ............................................................... 8

Navy Supply Corps Newsletter, NAVSUP Fuels: What the
    Fleet Runs On, Spring 2020, https://ufdcimages.uflib.ufl.edu/
    AA/00/04/80/19/00052/Spring-2020.pdf................................................. 7

iii

Statement of George A. Wilson, Director of Supply and
Transportation Division, Wartime Petroleum Supply and
Transportation, Petroleum Administration for War,
Special Committee Investigating Petroleum Resources,
S. Res. 36 (Nov. 28, 1945) ..................................................................... 9

Statement of Ralph K. Davies, Deputy Petroleum
Administrator of War, Special Committee Investigating
Petroleum Resources, S. Res. 36 (Nov. 28, 1945) ................................. 8

Statement of Senator O'Mahoney, Chairman, Special
Committee Investigating Petroleum Resources, S. Res. 36
(Nov. 28, 1945) ...................................................................................... 9

# INTEREST OF *AMICI CURIAE*[1]

Air Force General (Retired) Richard Myers served as Vice Chairman of the Joint Chiefs of Staff under President Clinton and as the 15th Chairman of the Joint Chiefs of Staff under President George W. Bush. He joined the Air Force in 1965 and served in the Vietnam War, flying over 600 combat hours in the F4 fighter jet, which used a specialized jet fuel produced by the private sector. General Myers held several commands and received numerous awards and decorations. After retiring from active duty, he served as President of Kansas State University from 2016 to 2021.

Navy Admiral (Retired) Michael Mullen served as the 17th Chairman of the Joint Chiefs of Staff under Presidents George W. Bush and Obama. After graduating from the Naval Academy, Admiral Mullen served in the Vietnam War. After earning a Master's Degree in Operations Research, Admiral Mullen served in numerous distinguished positions, including heading Naval Forces in Europe and NATO's Joint

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), counsel for *amici* state that no counsel for a party authored this brief, in whole or in part, and no party, party's counsel, or other person contributed money that was intended to fund preparing or submitting this brief.

Force Command and serving as Chief of Naval Operations, before his appointment as Chairman of the Joint Chiefs of Staff. Admiral Mullen is one of only four naval officers who has received four, 4-Star assignments. Admiral Mullen retired from his position in 2011 after serving for four years under both a Republican and Democratic President.

This brief does not focus on the merits of the litigation, upon which *amici* take no position, but, instead, on the appropriate venue. To assist the Court in understanding why a federal, not state, forum is appropriate, this brief provides a history of the federal government's—particularly, the military's—control and direction of Defendants-Appellants' production of petroleum products in the Louisiana coastal lands. Federally-directed petroleum production by private parties has been crucial for our armed forces, including during World War II ("WWII"). As Admiral Mullen once said, "[e]nergy security needs to be one of the first things we think about, before we deploy another soldier, before we build another ship or plane, and before we buy or fill another rucksack."[2] We submit this *amicus brief* to underscore practical concerns

---

[2] Office of the Secretary of Defense Public Affairs, *Mullen: Military Has 'Strategic Imperative' to Save Resources*, Energy Security Forum, Wash-

with the Panel Majority's decision, which the dissent captured in recognizing the "very real consequences, especially for federal contractors," from failing to interpret the federal officer removal statute liberally, as the standard of review requires. Op. at 42 (Oldham, J., dissenting).

## INTRODUCTION AND SUMMARY OF ARGUMENT

Based on over 80 years of combined military service, serving as Chairmen of the Joint Chiefs of Staff under both Democratic and Republican administrations, we can attest that petroleum products produced by private parties, like Defendants-Appellants, including those produced from activities in the Louisiana coastal zone, have been critical to our national security, military preparedness, and combat missions. To ensure the military has the energy indispensable to our warfighting capacity, the federal government directed Defendants-Appellants to obtain oil and gas products, including specialized aviation fuels. We are concerned the Panel Majority's affirmance of remand sets a dangerous precedent that could adversely impact our national security by allowing

---

ington, D.C., Oct. 13, 2010, https://www.dvidshub.net/news/58040/mullen-military-has-strategic-imperative-save-resources.

Louisiana state courts to second-guess decisions made by federal officers almost 80 years ago to maximize use of our natural resources to win WWII.

When the military calls upon private parties to help protect our Nation, it is imperative that those parties readily answer that call. One way the federal government incentivizes the support it needs from private industry is by ensuring that claims regarding those activities are not litigated in potentially prejudiced local venues, where localized—not national—interests may predominate.[3]

Here, the Panel Majority took an unduly narrow approach to applying the federal officer removal statute, 28 U.S.C. § 1442(a)(1), limiting its analysis to the four corners of the contracts, while affixing blinders to wartime demands and the regulatory context in which government and industry joined in this effort. Increasing crude exploration and production was essential to meeting the federal government's demand for vast quantities of high-octane aviation gasoline

---

[3] *See Watson v. Philip Morris Cos.*, 551 U.S. 142, 147-48 (2007) (explaining the federal officer removal statute was enacted to "protect federal officers" and those aiding or assisting them "from interference by hostile state courts") (quoting *Willingham v. Morgan*, 395 U.S. 402, 405 (1969); 9 Cong. Deb. 461 (1833)).

4

("avgas"). The vertical integration of the industry during the war, and Defendants-Appellants' resulting activities in Louisiana, would not have occurred without federal officials' direction and control to increase production. After all, if it were not for Defendants-Appellants' production of these petroleum products according to the military's particular requirements, the federal government would have had to manufacture them itself to fight the war. Defendants-Appellants simply could not have met their federally required avgas production targets without substantially increasing their crude production. Op. at 44-47 (Oldham, J., dissenting).

Appellees' position, however, seems to be that the war should have been managed differently: federal officers should have prioritized local environmental interests more and national-security interests less, and the Defendants-Appellants should have struck a different balance than the one directed by federal officers. That is the precise scenario that may not fairly get resolved in state court with local interests hostile to the national common good.

Affirming remand presents a dangerous chilling effect. It dis-incentivizes private parties from taking direction from federal officers in

service of our country for fear of becoming liable after-the-fact based upon subsequently-devised state-law rules. That has ominous implications for our national defense. It severely inhibits our military's deployment and warfighting capabilities, which maintain their superiority, in large part, through activities taken by private parties at the direction of federal officers—*e.g.*, making planes, tanks, and specialized avgas. Remanding creates a serious risk that, in the future, private industry will not readily answer the federal government's call when the nation needs it most.

Judge Oldham correctly concluded, therefore, that the Defendants-Appellants' increased crude production activities "plainly 'related to' their avgas contracts and hence satisfy today's federal officer removal statute." Op. at 54 (Oldham, J., dissenting). We urge the Court to grant rehearing.

## **ARGUMENT**

It appears the Panel Majority did not fully appreciate the depths to which federal officers have directed aspects of U.S. oil production for the Nation's defense, particularly during WWII. As Navy Captain Matthew Holman recently explained:

> Fuel is truly the lifeblood of the full range of Department of
> Defense (DoD) capabilities, and, as such, must be available on

specification, on demand, on time, every time. In meeting this
highest of standards, we work hand-in-hand with a dedicated
team of Sailors, civil servants, and contractors [*i.e.*, companies
like Defendants-Appellants] to deliver fuel to every corner of
the world, ashore and afloat.[4]

This federal direction and control has necessarily included inextricable
involvement in developing our domestic oil resources, especially where
necessary to address spiking wartime demands.

Hence, claims arising from that historic oil production, especially
in the Louisiana coastal zone, necessarily implicate federal officials' role
in the industry. Directives from federal agencies created to administer
petroleum production during WWII, coupled with the contracts here,
dictating Defendant-Appellants' actions, all worked together for federal
officers to control significant portions of our domestic fuel supply for the
Nation's defense.

The Panel's decision failed to recognize this special relationship
between the industry and the federal government. We respectfully
suggest that the Court reconsider the remand decision with this
historical context and wartime realities in mind.

---

[4] Navy Supply Corps Newsletter, NAVSUP Fuels: What the Fleet Runs
On, Spring 2020, https://ufdcimages.uflib.ufl.edu/AA/00/04/80/19/00052
/Spring-2020.pdf.

I.   **DURING WWII, THE FEDERAL GOVERNMENT DIRECTED AND CONTROLLED OIL PRODUCTION TO WIN THE WAR BY MAXIMIZING DELIVERY OF FUEL**

WWII confirmed petroleum's role as a key American resource and the government's interest in managing its production.[5] The Nation's need for large quantities of oil to produce high-octane aviation fuel ("avgas"), oil for ships, lubricants, and synthetic rubber far outstripped its capacity. Avgas, in particular, was viewed as "the most critically needed refinery product during World War II." *Shell Oil Co. v. United States*, 751 F.3d 1282, 1285 (Fed. Cir. 2014).

The federal government accordingly created agencies to control petroleum production and distribution, direct the production of certain products, and manage resources. This included the War Production Board ("WPB") and Petroleum Administration for War ("PAW"). PAW centralized the government's wartime petroleum-related activities in a way never possible by industry action alone, strictly directing and

---

[5] *See* Statement of Ralph K. Davies, Deputy Petroleum Administrator of War, Special Committee Investigating Petroleum Resources, S. Res. 36, at 4 (Nov. 28, 1945); National Petroleum Council, *A National Oil Policy for the United States* at 1 (1949).

controlling every phase of the industry, including crude oil production, refining, manufacturing, transporting, and distribution.

"PAW was further expected to designate for the military forces the companies in a given area from which the product could be secured, as well as the amount to be produced by each company and the time when the product would be available."[6] PAW's predecessor required that production levels be "fixed" in order to "efficiently," and to "the full[est] extent" possible, provide the crude needed for avgas production.[7] "No one who knows even the slightest bit about what the petroleum industry contributed . . . can fail to understand that it was, without the slightest doubt, *one of the most effective arms of this Government*" in fulfilling its core functions to defend the Nation.[8]

Federal officers' direction of Defendants-Appellants' petroleum exploration and production activities during WWII was particularly true

---

[6] Statement of George A. Wilson, Director of Supply and Transportation Division, Wartime Petroleum Supply and Transportation, Petroleum Administration for War, Special Committee Investigating Petroleum Resources, S. Res. 36 at 212 (Nov. 28, 1945).

[7] ROA.30653.

[8] Statement of Senator O'Mahoney, Chairman, Special Committee Investigating Petroleum Resources, S. Res. 36, at 1 (Nov. 28, 1945) (emphasis added).

in Louisiana's coastal zone. The specialized avgas that federal officers directed these refineries to produce exclusively for it was perhaps the most critical product to fuel the war efforts and the Allies' aerial supremacy. The military needed the crude oil out of the ground and the avgas in the planes as quickly and efficiently as Defendants-Appellants could produce it.

The Panel Majority's approach to interpreting the federal officer removal statute, however, fails to consider the full wartime context in which the federal Defense Supplies Corporation and energy producers entered into contracts with Defendants-Appellants during WWII to supply extraordinary amounts of avgas. The Panel Majority narrowly focused on the absence of express contractual terms specifying precisely how energy producers would acquire the enormous amounts of crude needed to fulfill their federal avgas obligations. Op. at 25-26.

The Panel Majority ignored the circumstances in which the parties entered and fulfilled these contracts, including federal regulations, PAW and WPB demands, and the end-product contracts themselves, all of which formed the background guidelines for the means and methods by which the federal contracts were to be fulfilled. Together, this context

demonstrated an understanding that for energy producers to supply the vast amounts of avgas that the federal government required for the war effort, they would need to substantially increase their own crude exploration and production—the conduct at issue in this suit. As Judge Oldham observed, "defendants had to get the crude oil from *somewhere.*" *Id.* at 39 (Oldham, J., dissenting).

Judge Oldham's dissent also recognizes that the Panel Majority's approach subjects contractors to the very "Catch-22," with which we are concerned. Forcing contractors to "limit their actions to the bare words of a federal contract and insist that the Government control every action related to that contract, or risk suit in a potentially hostile state court for any associated acts taken to better fulfill that contract." *Id.* at 42. That is not a choice that the federal officer removal statute demands, nor is it in our national security interest.

From our perspective, it is imperative to appreciate these are not just any contracts; these are military contracts made during wartime. That is not the time or place to force additional procedural hurdles and extra clauses to make crystal clear that the materials needed for the end-product do indeed "relate to" the federal directive. The military is under

11

extreme time pressures during wartime; we are concerned, therefore, by the delays the Panel Majority's approach seems to contemplate, when time is of the essence. Federal law does not require such bureaucratic dithering, especially in wartime, to secure the statutory promise of a neutral federal forum.

To be sure, we do not believe anything and everything touching the military is a national security issue requiring a federal forum. We value federalism principles and striking the right balance between federal and state interests. But military contracts for products needed to defend the nation during wartime would seem to fall heavily on the federal side. From our real-time, wartime, common sense perspective, this case squarely falls within the purview of federal courts, just as Congress envisioned in the federal officer removal statute.

## II. DEPRIVING DEFENDANTS-APPELLANTS OF A FEDERAL FORUM PRESENTS NATIONAL SECURITY RISKS BY IN-VITING PAROCHIAL SECOND-GUESSING OF FEDERAL OFFICERS AND DETERRING PRIVATE PARTIES FROM SUPPORTING NATIONAL DEFENSE PRIORITIES

Our Nation needs private parties to answer the call when asked to use their expertise to assist our national defense. One of the important ways to incentivize private parties to take direction from the federal

government is ensuring that, if someone attempts to hold them liable for such actions, the federal officer removal statute gives them the right to have those actions judged in "a federal forum rather than face possibly prejudicial resolution of disputes in state courts." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2021) (*en banc*). The "statute's 'basic' purpose is to protect the Federal Government from the interference with its 'operations' that would ensue were a State able, for example, to" impose its laws and judgment on "'officers and agents' of the Federal Government 'acting...within the scope of their authority.'" *Watson*, 551 U.S. at 150 (quoting *Willingham*, 395 U.S. at 406).

Remanding this case undermines the purposes of the removal statute, allowing a state court to second-guess decisions made by federal officers and, in the process, discouraging private parties from taking direction from those federal officers for fear of future liability. That weakens our armed forces while strengthening our enemies, which have appropriately incentivized and been supported by their private sector. The devastating implications for our national defense are not hypothetical. After 9-11, for example, our Nation needed specialized protective equipment, which the military did not have. If private-sector

parties producing the equipment had said "no," fearing future liability from the government not spelling out every detail in the contracts, that would have left our troops at great risk.

Our constitutional oath as military officers includes a commitment to ensure that we have sufficient capabilities to accomplish our missions. It is therefore our duty to enable a cooperative private sector and ensure a plentiful supply of things critical to our national defense, like specialized fuels, particularly during wartime. To protect our Nation, decisions about such matters are delegated to the federal officers tasked with our foreign policy and national security. Congress, in turn, requires that such decisions be judged in a federal forum. That is where this case belongs.

## CONCLUSION

This Court should grant rehearing.

Respectfully submitted,

By: */s/ Tristan L. Duncan*
Tristan L. Duncan
SHOOK, HARDY & BACON L.L.P.
2555 Grand Blvd.
Kansas City, MO 64108
(816) 474-6550
tlduncan@shb.com

14

Cary Silverman
SHOOK, HARDY & BACON LLP
1800 K Street, N.W., Ste. 1000
Washington, DC 20006
(202) 783-8400
csilverman@shb.com

Daniel B. Rogers
SHOOK, HARDY & BACON L.L.P.
201 South Biscayne Blvd., Ste. 3200
Miami, FL 33131
(305) 358-5171
drogers@shb.com

*Counsel for Amici Curiae*
*General (Retired) Richard B. Myers and*
*Admiral (Retired) Michael G. Mullen*

# CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT

I hereby certify that:

1.     This *amicus* brief complies with the type-volume limit of Fed. R. App. P. 29(b)(4) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 2,588 words.

2.     This *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because the brief has been prepared in proportionately-spaced typeface using Microsoft Word 2016, Century Schoolbook 14-point font.

Dated: July 10, 2024          */s/ Tristan L. Duncan*
                              Tristan L. Duncan
                              SHOOK, HARDY & BACON L.L.P.
                              *Counsel for Amici Curiae*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 10, 2024, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system, which will serve all counsel of record.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: July 10, 2024　　　　*/s/ Tristan L. Duncan*
　　　　　　　　　　　　　　Tristan L. Duncan
　　　　　　　　　　　　　　SHOOK, HARDY & BACON L.L.P.
　　　　　　　　　　　　　　*Counsel for Amici Curiae*

17