No. 23-30422

_____

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

_____

PARISH OF CAMERON
*PLAINTIFF – APPELLEE*

STATE OF LOUISIANA, EX REL, ON BEHALF OF JEFF LANDRY; STATE OF LOUISIANA, ON BEHALF OF LOUISIANA DEPARTMENT OF NATURAL RESOURCES, ON BEHALF OF OFFICE OF COASTAL MANAGEMENT, ON BEHALF OF THOMAS F. HARRIS,
*INTERVENOR PLAINTIFFS – APPELLEES*

V.

BP AMERICA PRODUCTION COMPANY; CHEVRON U.S.A. INCORPORATED, OWN CAPACITY & AS SUCCESSOR IN INTEREST, ON BEHALF OF CALIFORNIA COMPANY; SHELL OIL COMPANY; SWEPI, L.P.,
*DEFENDANTS – APPELLANTS*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF LOUISIANA CIVIL ACTION NO. 2:18-CV-688

_____

**PLAINTIFF-APPELLEE' AND INTERVENORS PLAINTIFFS-APPELLEES' RESPONSE TO APPELLANTS' PETITIONS FOR REHEARING EN BANC AND PETITIONS FOR PANEL REHEARING**

*By Attorneys for Plaintiff-Appellee, the Parish of Cameron*

Donald T. Carmouche (2226)
Victor L. Marcello (9252)
John H. Carmouche (22294)
William R. Coenen, III (27410)
Brian T. Carmouche (30430)
Todd J. Wimberley (34862)
Ross J. Donnes (33098)
D. Adele Owen (21001)
Leah C. Poole (35092)
Christopher D. Martin (30613)
Michael L. Heaton (38773)
TALBOT, CARMOUCHE &
MARCELLO
17405 Perkins Road
Baton Rouge, LA 70810
Telephone: (225) 400-9991
Fax: (225) 448-2568

Chad E. Mudd (25188)
David P. Bruchhaus (24326)
M. Keith Prudhomme (14336)
Matthew P. Keating (30911)
Wesley A. Romero (33344)
Jamie C. Gary (29203)
MUDD, BRUCHHAUS &
KEATING, L.L.C.
422 E. College St., Ste. B
Lake Charles, LA 70605
Telephone: (337) 562-2327
Fax: (337) 562-2391


*By Attorneys for Intervenor Plaintiff-Appellee, the State of Louisiana,*
*through the Department of Natural Resources,*
*Office of Coastal Management and its Secretary, Thomas F. Harris:*

J. Blake Canfield (30426)
Executive Counsel
Donald W. Price (19452)
Special Counsel
LOUISIANA DEPARTMENT OF
NATURAL RESOURCES
Post Office Box 94396
Baton Rouge, LA 70804
Telephone: (225) 342-2710

*By Attorneys for Intervenor Plaintiff-Appellee,*
*the State of Louisiana, Ex Rel. Liz Murrill, Attorney General*

David A. Peterson (22591)
Interim Chief, Lands & Natural Resources Section
LOUISIANA DEPARTMENT OF JUSTICE
1185 North 3rd Street
Baton Rouge, LA 70802
Telephone: (225) 326-6000
Cell: (225) 312-1913
Fax: (225) 326-6099

## CERTIFICATE OF INTERESTED PARTIES

The undersigned counsel of record certifies that the following listed persons and entities, as described in the fourth sentence of Fifth Circuit Rule 28.2.1, have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

### PLAINTIFF - APPELLEE:

The Parish of Cameron

#### COUNSEL FOR PLAINTIFF – APPELLEE:

Donald T. Carmouche, Victor L. Marcello, John H. Carmouche, William R. Coenen, III, Brian T. Carmouche, Ross J. Donnes, D. Adele Owen, Leah C. Poole, Christopher D. Martin, and Michael L. Heaton with Talbot, Carmouche & Marcello; and Chad E. Mudd, David P. Bruchhaus, M. Keith Prudhomme, Matthew P. Keating, Wesley A. Romero, and Jamie C. Gary with Mudd, Bruchhaus & Keating, L.L.C.

### INTERVENORS PLAINTIFFS - APPELLEES:

The State of Louisiana, *ex rel.* Liz Murrill, Attorney General; and The State of Louisiana, through the Louisiana Department of Natural Resources, Office of Coastal Management and its Secretary, Thomas F. Harris

#### COUNSEL FOR INTERVENORS PLAINTIFFS - APPELLEES:

David A. Peterson with the Louisiana Department of Justice for the State of Louisiana, *ex rel.* Liz Murrill, Attorney General

J. Blake Canfield and Donald W. Price with the State of Louisiana, through the Department of Natural Resources, Office of Coastal Management, and its Secretary, Thomas F. Harris

**D<small>EFENDANTS</small> - A<small>PPELLANTS</small>:**

Chevron U.S.A. Inc., BP America Production Company, Shell Offshore, Inc., Shell Oil Co., and SWEPI LP

**C<small>OUNSEL</small> F<small>OR</small> D<small>EFENDANTS</small> - A<small>PPELLANTS</small>:**

Alexandra White, Eric J. Mayer with Susman Godfrey; Charles S. McCowan, III, Pamela R. Mascari, Michael R. Phillips, and Claire E. Juneau with Kean Miller LLP; Peter D. Keisler and Jennifer J. Clark with Sidley Austin LLP; Paul D. Clement, C. Harker Rhodes IV, and Joseph J. DeMott with Clement & Murphy, PLLC for Chevron U.S.A. Inc.

George Arceneaux III with Liskow & Lewis; Nancy G. Milburn and Jennifer Kwapisz with Arnold & Porter Kay Scholer LLP; and Daniel S. Severson with Kellogg, Hansen, Todd, Figel & Frederick, P.L.L.C., for BP America Production Company

Russell Keith Jarrett, Kelly Brechtel Becker, Laura Springer Brown, and Mark L. McNamara with Liskow & Lewis for Shell Offshore, Inc., Shell Oil Co., and SWEPI LP

**A<small>MICI</small> C<small>URIAE</small>:**

The Chamber of Commerce of the United States of America, The National Association of Manufacturers, and American Petroleum Institute

**C<small>OUNSEL FOR</small> A<small>MICI</small> C<small>URIAE</small>:**

Andrew Kim and William M. Jay with Goodwin Procter LLP on behalf of amici curiae the Chamber of Commerce of the United States of America and the National Association of Manufacturers

Andrew R. Varcoe and Mariel A. Brookins of the U.S. Chamber Litigation Center  on behalf of amicus curiae the Chamber of Commerce of the United States of America

Michael A. Tilghman II and Erica of the NAM Legal Center on behalf of amicus curiae the National Association of Manufacturers

W. Christopher Pooser and Jason T. Morgan with Stoel Rives LLP on behalf of amicus curiae for the American Petroleum Institute

/s/ *Victor L. Marcello*

*Attorney of Record for Plaintiff-Appellee,*
*the Parish of Cameron*

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iv

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  v

I.     INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.    MAJORITY DID NOT REINSTATE THE PRE-*LATIOLAIS*
       CAUSAL NEXUS TEST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.   THE FACTS DO NOT SUPPORT A CONNECTION OR ASSOCIATION . . . . . . . . .  5

IV.    NO CONFLICT WITH SISTER CIRCUITS . . . . . . . . . . . . . . . . . . . . . . . . . .  12

V.     REGULATORY BACKGROUND IRRELEVANT TO "RELATED TO" PRONG . . . .  14

VI.    *AMICI* BRIEFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

VII.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

# TABLE OF AUTHORITIES

*Buljic v. Tyson Foods, Inc.,*
  22 F.4th 730. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*In re Commonwealth's Motion,*
  790 F.3d at 469 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12-13

*Latiolais v. Huntington Ingalls, Inc.,*
  951 F.3d 286 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Maglioli v. Alliance HC Holdings,*
  16 F.4th 393 (3d Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Mitchell v. Advanced HCS,*
  24 F.4th 580 (5th cir. 2022), 2022 WL 714888 . . . . . . . . . . . . . . . . . . . . 15

*Moore v. Electric Boat,*
  25 F.4th 30, 36 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Morales v. Trans World,*
  504 U.S. 374, 390 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Plaquemines Par v. BP Am. Prod. Co.,*
  103 F.4th 324, 341 (5th Cir. 2024). . . . . . . . . . . . . . . . . . 2-5, 7-8, 10-12, 14

*Plaquemines Par. v. Chevron USA,*
  84 F.4th 362, 368 (5th Cir. 2023). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Plaquemines Par. v. Chevron USA, Inc., (Plaquemines II)*
  22-30055, 2022 WL 9914869 (5th Cir. Oct. 17, 2022),
  *cert. denied* 143 S.Ct. 991 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

*Plaquemines Parish v. Northcoast Oil Company, et al.,*
  No. 2:18-cv-05228 (E.D. La.) . . . . . . . . . . . . . . . . . . . . . . . . . . . 1-2, 5, 12

*Sawyer v. Foster Wheeler LLC,*
  860 F.3d 24, 255 (4th Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

v

28 U.S.C. § 1442 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

28 U.S.C. § 1442(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## I.    INTRODUCTION

Beginning in 2013, six Louisiana parishes filed forty-two coastal lawsuits, each of which addressed violations of the Louisiana State and Local Coastal Resources Management Act (SLCRMA) in a distinct, geographically defined "operational area" of the coastal zone. All forty-two cases were removed for a second time on grounds of federal officer jurisdiction based on allegations of federal control of defendants' WWII *crude production* activities. The Eastern and Western Districts each designated a lead case and stayed their remaining cases based on defendants' representations that these lead cases would "resolve jurisdictional issues that cut across all of the removed SLCRMA cases."[1] In *Plaquemines II*, this Court found no federal officer jurisdiction in both lead cases.[2]

After *Plaquemines II*, the defendants in eleven of the forty remaining cases urged an entirely new "refinery argument," alleging that the directives in their federal refinery contracts support federal officer jurisdiction because they refined some of the crude that they themselves produced from the "operational areas" defined in each of the eleven cases. In the remaining twenty-nine removed cases, crude was refined by

---

[1]*Plaquemines Par. v. Chevron USA*, 84 F.4th 362, 368 (5th Cir.2023), quoting *Northcoast*, 669 F.Supp.3d 584, 587 (E.D. La.2023).

[2]*Plaquemines II*, 22-30055, 2022 WL 9914869 (5th Cir. Oct.17, 2022), *cert. denied* 143 S.Ct. 991.

government-contracted refineries that defendants did not own. In *Plaquemines II*, the defendants' crude production was refined by non-owned refineries *and corporate affiliates*.[3] Appellants contend *Plaquemines II* is distinguishable.

Appellants seek an *en banc* rehearing because the "panel majority's decision flouts the Court's *en banc* decision in *Latiolais*."[4] In *Latiolais*, the government contractually directed Avondale to use asbestos. Accordingly, Latiolais' claims alleging Avondale did not safely use asbestos were related to the government's contractual directive. By contrast, WWII refinery contracts did not direct any refiner to refine the crude it produced, much less the crude it produced from a defined "operational area" or oilfield. WWII refinery "contracts gave Defendants 'complete latitude ... to forego producing any crude and instead to buy it on the open market.'"[5]

As shown here, Appellants' arguments and the dissent are inconsistent with *Latiolais* and *Plaquemines II*.

## II.    MAJORITY DID NOT REINSTATE THE PRE-*LATIOLAIS* CAUSAL NEXUS TEST

Appellants' primary argument is that the majority reinstates the pre-*Latiolais*

---

[3]In *Plaquemines II,* Humble Oil did not refine the crude it produced in the Potash Field. But some of Humble's Potash crude was refined by SOLA, Humble's government-contracted corporate affiliate.

[4]23-30422,Doc.156,ECF p. 24.

[5]*Plaquemines Par. v. BP Am. Prod. Co.*, 103 F.4th 324, 341 (5th Cir.2024), quoting *Northcoast,* 669 F.Supp.3d at 597–98.

causal nexus test by "requiring a specific contractual 'directive pertaining to Defendants' oil production activities,'"[6] and by "looking to the 'relationship between' the 'conduct challenged in Plaintiffs' complaints and *the relevant federal directives in Defendants' refinery contracts.*"[7] The fourth prong of the *Latiolais* test requires that "the charged conduct [be] connected or associated with an act pursuant to a federal officer's directions."[8] The majority found that while "Defendants need not show that a federal officer directed the specific oil production activities being challenged, they still must show these activities had a sufficient connection with directives in their federal refinery contracts."[9] The majority then concludes that the "lack of *any* contractual provision pertaining to oil production or directing Defendants to use only oil they produced is what distinguishes these cases from *Latiolais*."[10] Contrary to Appellants' argument, the majority did not require that Appellants show "a specific contractual directive" pertaining to crude production. Instead, it found federal officer jurisdiction lacking because there was no evidence of *any* contractual directive related to Appellants' crude production.

---

[6] 23-30422.Doc.156, ECF p. 17.

[7] 23-30422.Doc.156, ECF p. 28, quoting Op.25 (emphasis in original).

[8] *Latiolais v. Huntington Ingalls*, 951 F.3d 286, 296 (5th Cir.2020).

[9] 103 F.4th 324, 341.

[10] *Id.*

Analogizing the present facts to *Latiolais*, Appellants argue that "[j]ust as the federal contracts here required Defendants to refine massive amounts of crude oil but did not direct how to obtain that crude, the federal contract in *Latiolais* required the contractor to refurbish the ship with asbestos but was silent about 'how to install the asbestos,' including any 'safety protocols the contractor would employ,' and said nothing at all about safety warnings."[11] This plainly false analogy entirely misses the point. As noted by the majority, "[t]hese refinery cases would be more analogous to *Latiolais* if, for example, Defendants' federal contracts required them to produce their own crude oil but were silent as to the production practices challenged by Plaintiffs. Alternatively, *Latiolais* would be closer to these cases if Avondale's federal contract required it to refurbish ships with thermal insulation but did not specify what type of material should be used for insulation."[12]

Remarkably, Defendants insist that to satisfy *Latiolais'* connection test, the federal direction need not "even generally address [the challenged conduct]."[13] Under this incredibly expansive interpretation of the statute, federal officer jurisdiction would have been established in *Latiolais* even if the Navy's contract had not

---

[11]23-30422.Doc.156, ECF p. 27.

[12]103 F.4th 324, 342.

[13]23-30422.Doc.156, ECF p. 27("Congress chose to require only that the challenged conduct 'relat[e] to any act under' federal direction, 28 U.S.C. §1442(a)(1), not that federal direction must control or *even generally address that conduct*." (emphasis added).

4

mentioned asbestos at all.[14]

## III. THE FACTS DO NOT SUPPORT A CONNECTION OR ASSOCIATION

The government did not issue "wartime orders to increase production from the areas targeted by Plaintiffs' lawsuit."[15] Neither the directives in Appellants' refinery contracts nor the "minimal" WWII crude production regulations even so much as mention the "areas targeted by Plaintiffs' lawsuit[s]."[16] Appellants do not argue that during WWII, their refineries focused only on the operational areas targeted in the refinery cases when they ***purportedly*** decided to increase their own crude production to meet the demands of their refinery contracts. Regardless, the government issued no "wartime orders" to anyone to increase crude production.[17]

Quoting the dissent, Appellants argue that "Defendants 'needed a gargantuan volume of crude oil.' Op.46. 'So, predictably, they engaged in expanded production practices.' Op.46. Accordingly, the 'charged conduct'– Defendants' exploration and production activities–is plainly 'connected or associated' with Defendants' 'act[s]

---

[14]As noted in *Northcoast,* "every case that the Court has reviewed, including the post-*Latiolais* decisions, that grounds federal officer removal on relatedness to a federal contract, examines the directives of that contract when determining . . . whether the plaintiff's claims relate to the directives of a federal officer." 2023 WL 2986371 (E.D. La. Apr. 18, 2023), at *9.

[15]Doc 156, ECF p. 18.

[16]The majority accurately characterizes WWII crude regulations as "minimal." 103 F.4th at 339.

[17]See footnote 28, *infra.*

pursuant to a federal officer's directions.' *i.e.*, their refining of massive amounts of avgas under federal contracts. Op.38, Op.45-46."[18]  Hence, the crux of Appellants' argument is that *Latiolais*' "related to" prong is "plainly" satisfied simply because it takes more crude to produce more avgas, even when the contractual directives to produce avgas say nothing whatsoever about crude production.

The majority concluded, and the record confirms, that the production of crude oil used to refine avgas was entirely unrelated to the directives in WWII refinery contracts.  Practically all of the forty-two coastal cases involve at least one "vertically integrated" defendant that operated a government-contracted avgas refinery. Yet only eleven cases involve a defendant that refined the crude it produced from the operational area defined in each complaint, and in these eleven cases, the refiner-defendants also refined crude they *did not* produce.[19] These facts are merely reflective of the operation of the government's WWII crude allocation program, and directly refute any notion of a connection between crude production and directives in refinery contracts with "vertically integrated companies." While obviously Appellants needed more crude to produce more avgas, the same could be said of the "vertically integrated" government-contracted defendants in the remaining thirty-one Louisiana

---

[18]23-30422.Doc.156, ECF p. 27.

[19]See, *e.g.,* ROA.23-30422.28864(Humble's Potash crude delivered to Shell Norco refinery).

coastal cases (including *Plaquemines II*) that did not refine the crude they produced from the operational areas defined in the complaint. In fact, as noted by the majority, Shell did not refine the crude it produced in the operational areas defined in nine of thirteen cases in which it was sued.[20] Likewise, Humble was a "vertically integrated company" that did not refine the crude it produced in *Plaquemines II* because the PAW's crude allocation program did not allocate any of its Potash crude to its Baytown, Texas refinery.

Appellants admit that the PAW "control[ed] the allocation . . . of crude."[21] The unrefuted evidence of the PAW's allocation program shows that ***after*** crude was produced without federal direction in the field, the PAW programmed its distribution and transportation to refineries, and that a particular refiner's production of crude played no part in whether it was allocated that crude by the PAW. Defense expert Gravel explains that "PAW's crude oil assignments [to refineries] took into consideration a range of factors, including efficiency of transport of both crude and refined products, capacity of the refinery to handle the volume of crude, and the types of war products that could be made from select crudes."[22] Absent from this list of

---

[20] 103 F.4th 324, footnote 92.

[21] 23-30422.Doc. 57,ECF p. 32.

[22] Gravel, ROA.23-30422.28864, ¶ 68. ROA.23-30422.28860-61, ¶ 65.

7

factors is the crude producer's conduct in producing crude, and its relationship or affiliation, if any, with the refiner.

Gravel also notes that PAW "allocated crude oil produced by coastal Louisiana fields to specific refineries on the basis of obtaining the maximum amount of critical war products from the minimum run of crude oil."[23] Plaintiff's expert Brigham similarly explains that "after crude was produced at a well, it was allocated to refineries *not on the basis of which company owned the crude*, but 'providing first for the minimum quantities estimated to be necessary to assure maximum output of war products.'"[24] Based on this uncontested evidence, the majority concluded that "[i]n allocating the crude oil, the PAW considered neither the practices of the producer nor whether the company that produced the crude had an affiliated refinery."[25]

The record directly refutes any suggestion that any defendant had to produce its own crude to satisfy its avgas contracts. The war triggered market demands for crude oil that were virtually unlimited, and the industry did not have to be pressured, directed, ordered, controlled, or cajoled to meet those demands.[26] WWII crude was

---

[23]ROA.23-30422.28826.

[24]ROA.23-30422.13853-55.

[25]103 F.4th 324, 344

[26] ROA.23-30422.506 ("No Government agency had to compel [the oil industry] to do the job."); ROA.23-30422.28883 ("production of oil in [Louisiana] reached an all time high"); ROA.23-30422.46907 (Ralph Davies: "The war caused a heavy drain on the oil fields of this country."); see

purchased on the open market by refineries from crude producers and from each other.[27] No government controls of crude production were required to ensure that refineries had access to the crude they needed to comply with government contracts. In fact, to the extent the government "minimally" regulated WWII crude production, the primary focus of these regulations was the conservation of crude oil reservoirs, not increased production.[28]

---

abundant evidence of practicing historians and government officials, ROA.23-30422.13843-14422. Shell's company magazine proclaimed: "Facing the demands of national defense, the petroleum industry merely asks how much of a product is needed, when and where. Its enormous capacity for performance will not be exerted to the full under any conditions that can possibly arise." ROA.23-30422.14486.

[27]ROA.23-30422.32255-32258 (SOLA refined crude from fifteen different producers); ROA.23-30422.31218-31239 (Pan American refinery purchased crude from dozens of producers); ROA.23-30422.28825-28826, ¶¶ 5(5)-5(6) (PAW directed crude to refineries without regard to refiner/producer affiliation); ROA.23-30422.31351,31377-31380, ¶¶ 8(E), 80-83 (integrated oil companies routinely bought and sold crude amongst themselves); ROA.23-30422.45069-72 (large quantities of crude purchased from non-owned producers); ROA.23-30422.28915(Humble's Potash crude sent to competitors and affiliates); ROA.23-30422.28866, 28915 (Stanolind sent crude to various refiners); ROA.23-30422.7906-7 (Amerada crude sent to non-owned refineries).

[28]The government set crude production rates that were conservation measures known as "allowables" that were designed to limit production to avoid damage to oil reservoirs. Defendants faced consequences only for producing more than their allowables, not less. The PAW set "maximum efficient rates" of production on a state-by-state basis, and allowed each state the discretion to allocate their total production under state conservation laws. No company was ever ordered to produce more crude at an "overly high" rate. See evidence cited at 23-30422.Doc84-1,ECF pp.53-54. PAW's Production Director explained that PAW "was faced with trying to supply an adequate quantity of crude oil over an indefinite period of time. No one knew when the war would end. Therefore, plans had to be made for a long war. It would have been careless to plan operations to produce at excessive rates in the early part of the war, to find later that through excessive decline the capacity was insufficient to carry on." ROA.23-30422.21030.

The majority found that the PAW's crude allocation program "severed" any link between crude production and refining.[29] The dissent ignores this severed link by redefining the supply chain as a series of connected links that, conveniently, excludes the allocation program.[30] The majority ultimately concludes that the allocation program is alone sufficient to render *Plaquemines II* indistinguishable:

> At base, whether or not Defendants happened to refine their own crude oil in fulfilling their federal contracts had nothing to do with any actions they took pursuant to a federal directive. Instead, it depended on "happenstance or logistical preference." Particularly illustrative of this point is the outcome in *Plaquemines II*, in which one defendant, Humble Oil, was a vertically-integrated oil company that produced oil in the Operational Area and had a refinery under federal contract to refine avgas. However, Humble Oil did not rely on its federal refinery contract in seeking removal due to the fact that none of the crude oil it produced in the relevant Operational Area was sent to its refinery. **Crucially, this means that the only difference between Humble Oil and Defendants here is that the PAW allocated to Defendants' refineries some of the crude oil they produced in the Operational Areas. To permit removal here, but not in *Plaquemines II*, would lead to illogical and disparate results inconsistent with the overall purpose of the federal**

---

[29] 103 F.4th 324, 341–42 ("[E]ven that attenuated connection was severed by Defendants' lack of control over where their crude oil was refined and by their use of crude oil purchased on the open market from other producers to comply with their contractual obligations. Thus, unlike *Latiolais*, or even *Morales*, the instant cases require various intermediary (and ultimately severed) links to connect the federal directives and challenged conduct.").

[30] 103 F.4th 324, 351 ("Defendants used certain exploration and production practices because of increased need for crude oil (link one), and there was increased need because of the refining contracts (link two). But even on the majority's telling these supply-chain links are, well, linked. And hence they are connected."). Even "link one" is pure conjecture, as there is no credible evidence that "Defendants used certain [E&P] practices *because* of increased need for crude." 23-30422.Doc. 84-1, ECF pp.51-57.

**officer removal statute.**[31]

The dissent's footnote 4 responds to the majority's view that *Plaquemines II* controls the result here by blaming the *Plaquemines II* defendants (some of whom are defendants here) for failing to allege that they "acted under" their refinery contracts instead of their *alleged* subcontracts.  But even if the *Plaquemines II* defendants had urged the dissent's suggested argument, they could not have shown that *they* "acted pursuant to a federal officer's directions" because they did not refine the crude they themselves produced in the case. Perhaps the dissent believes, contrary to *Latiolais*, that a *non-defendant's* act under color of federal office would support federal officer jurisdiction. But, at least for now, *Latiolais* and *Plaquemines II* (and presumably §1442 itself) control the result here.[32]

Quoting the dissent, Appellants argue that "[f]orgoing the challenged crude exploration and production practices would have hampered the federal interest in refined avgas explicitly outlined in [Defendants'] contracts."[33] In response, the

---

[31]103 F.4th 324, 344–45 (emphasis added).

[32]The claims in all forty-two coastal cases are expressly limited to the defendants' activities within the "operational area" defined in each complaint. By consent, this Court has stayed thirteen "non-refinery" cases.  In these "non-refinery" cases, defendants urge yet another new argument that, despite this limitation of claims to operational area activities, contaminant migration from operational areas in the "refinery cases" to the non-refinery operational areas is sufficient to support §1442 jurisdiction. Thus, a finding of federal jurisdiction here will require yet another round of briefing and argument in this now eleven years long dispute over federal jurisdiction.

[33]23-30422.Doc.156, ECF p.24.

11

majority notes that "Defendants point to no evidence, aside from their statuses as vertically-integrated companies that needed to refine increased quantities of avgas, to support this assertion."[34] In fact, the evidence makes clear not only that Defendants lacked control over whether they refined their own crude oil, but also that their refineries regularly relied on crude oil produced by other companies to fulfill their federal avgas contracts."[35]

Appellants fault the majority for "overlooking" contractual references to crude prices and taxes in applying *Latiolais*' "connection" test.[36] Tellingly, Appellants likewise "overlooked" those references in their prior briefing. These crude price and tax references are not even tangentially related to crude production *activities*.

## IV.   NO CONFLICT WITH SISTER CIRCUITS

In *In re Commonwealth's Motion to Appoint Counsel*, the Third Circuit did not, as Appellants imply, merely rely on the impact that state post-conviction proceedings would have on subsequent federal habeas proceedings in finding the "relating to" requirement was satisfied. The Federal Community Defender, a nonprofit entity

---

[34]103 F.4th 324, 345

[35]*Id.* ("their refineries regularly relied on crude oil produced by other companies")*. See also* footnote 27*, supra.* Appellants contend their contracts contain "explicit 'instructions for gathering the required component parts of avgas.'" 23-30422.Doc.156, ECF p. 2.These "component parts" are cumene and alkylate, which are *refined products*, not crude. 23-30422.7901, ¶77; ROA.23-30422.47425-47427.

[36]Panel Rehearing Motion, 23-39422.Doc.155, ECF pp.19-20.

created by the Criminal Justice Act (CJA), is expressly delegated authority to provide representation under the CJA.[37] As the Third Circuit explained, "the Federal Community Defender attorneys' employment with the Federal Community Defender is the very basis of the Commonwealth's decision to wage these disqualification proceedings against them. The Commonwealth has filed these motions to litigate whether the Federal Community Defender is violating the federal authority granted to it."[38] The Third Circuit went on, "As the Supreme Court has noted, whether a federal officer defendant has completely stepped outside of the boundaries of its office is for a federal court, not a state court to answer."[39] Appellants, on the other hand, have failed at every turn to point to any "federal authority" granted them regarding crude production.

Appellants' reliance on *Moore v. Electric Boat* is similarly misplaced. In *Moore*, "[t]he Navy dictated the use of asbestos, workplace safety measures, and the posting of warnings both on the submarine and at the Electric Boat shipyard. Thus, all of Moore's claims as to Electric Boat, too, clearly 'relate to' Electric Boat's actions taken while 'acting under' color of federal office."[40]

---

[37] *In re Commonwealth's Motion*, 790 F.3d at 469.

[38] *Id.* at 472.

[39] *Id.*

[40] 25 F.4th 30, 36.

## V.     REGULATORY BACKGROUND IRRELEVANT TO "RELATED TO" PRONG

Appellants argue that the majority erred – and created a circuit conflict – "by refusing to consider the broader regulatory background in deciding whether" the "related to" prong was satisfied.[41]  While conceding that "compliance with federal regulations alone cannot show that a private party is 'acting under' federal direction,"[42]  Appellants assert, without a shred of supporting evidence, that: (1) the government's "Critical Fields" designation was made in "carrying out" the crude allocation program (it was not); and (2) that the government "specified (by regulation)" that they should refine crude from these "Critical Fields Essential to the War Program" into avgas (no such "regulation" exists).[43]  In their principal brief on the merits, Appellants mentioned no such regulation, but noted that the government merely "knew" that "high value" crude from the Black Bayou Field at issue was being refined at Shell's refineries.[44]  The "alternative fact" of an alleged "Critical Fields regulation" makes its first appearance here.  Importantly, Shell's refinery contracts

---

[41]23-30422.Doc.156,ECF p. 29.

[42]*Id*. at ECF p.30.

[43]*Id*. at ECF pp. 40-41.

[44]103 F.4th 324, 338, fn.64. The "Critical Fields" designation was merely the result of a PAW field survey entitled "Preliminary Survey Listing Critical Fields Essential to the War Effort." ROA.23-30422.7900,10054.

do not mention the Black Bayou Field, or any "Critical Fields."

The primary focus of the PAW's designation of a field as a "Critical Field" was its geographical location and susceptibility to sabotage.[45] Appellate courts, including this Court, have treated similar federal designations as meaningless.[46] This Court found no federal officer jurisdiction in *Plaquemines II,* even though the Potash Field was classified as a "Critical Field."[47]

Appellants misconstrue *Sawyer v. Foster Wheeler.*[48] The "associated regulations and procedures" were irrelevant insofar as Foster Wheeler "manufactured boilers for the U.S. Navy under the Navy's strict specifications."[49] *Sawyer* does not state, as Appellants argue, that the "associated regulations and procedures" were what "provided for a comprehensive set of warnings." The "associated regulations" had nothing to do with the court's "related to" findings. *Sawyer* makes clear that the Navy "required the use of asbestos in boilers for which it contracted with Foster Wheeler to manufacture; that **it** provided for a comprehensive set of warnings, but not all

---

[45]ROA.23-30422.30246,30250,13848.

[46]*Mitchell,* 24 F.4th 580; *Buljic,* 22 F.4th 730; *Maglioli,* 16 F.4th 393.

[47]Defendants Opening Brief, *Plaquemines II* (No. 22-30055), page 24.

[48]860 F.3d 249.

[49]860 F.3d at 252.

possible warnings; and that Foster Wheeler complied with the Navy's requirements."[50]

## VI. *AMICI* BRIEFS

*Amici* misapprehend and misrepresent the panel's ruling, the records of these cases, or both. They merely echo the Appellants' arguments, namely, that the majority revives the pre-*Latiolais* causal nexus test, while *Latiolais* "only requires a mere connection or association between a challenged conduct and the federal officer's directions, rather than a direct causal relationship."[51] Both the API and Messrs. Myers and Mullen respond by describing the PAW's alleged authority "to control and manage every aspect of the oil industry"[52] and its "direction and control to increase production."[53] These complaints come much too late, as *Plaquemines II* found that WWII crude production was merely regulated, but not controlled, by the PAW.

## VII. CONCLUSION

Appellants' "connection" argument is devoid of any factual support, and effectively eviscerates *Latiolais*' fourth prong, thereby implicating the rule of orderliness. Rehearing should be denied.

---

[50] *Id.* at 258.

[51] 23-30422.Doc.180-2, ECF p.19(API);Doc.166-1, ECF p. 7(USC/NAM).

[52] 23-30422.Doc.180-2, ECF p.20 (API).

[53] Myers/Mullen Brief, p. 5.

*By Attorneys for Plaintiff-Appellee, the Parish of Cameron:*

TALBOT, CARMOUCHE & MARCELLO
17405 Perkins Road
Baton Rouge, LA 70810
Telephone: (225) 400-9991
Fax: (225) 448-2568

*/s/ Victor L. Marcello*
Donald T. Carmouche, (02226) (dcarmouche@tcmlawoffice.com)
Victor L. Marcello, (09252) (vmarcello@tcmlawoffice.com)
John H. Carmouche, (22294) (jcarmouche@tcmlawoffice.com)
William R. Coenen, III, (27410) (wcoenen@tcmlawoffice.com)
Brian T. Carmouche, (30430) (bcarmouche@tcmlawoffice.com)
Todd J. Wimberley, (34862) (twimberley@tcmlawoffice.com)
Ross J. Donnes, (33098) (rdonnes@tcmlawoffice.com)
D. Adele Owen, (21001) (aowen@tcmlawoffice.com)
Leah C. Poole, (35092) (lpoole@tcmlawoffice.com)
Christopher D. Martin, (30613) (cdmartin@tcmlawoffice.com)
Michael L. Heaton, (38773) (mheaton@tcmlawoffice.com)

-and-

Chad E. Mudd, (25188) (cmudd@mbklaw.net)
David P. Bruchhaus, (24326) (dbruchhaus@mbklaw.net)
M. Keith Prudhomme, (14336) (kprudhomme@mbklaw.net)
Matthew P. Keating, (30911) (mkeating@mbklaw.net)
Wesley A. Romero, (33344) (wromero@mbklaw.net)
Jamie C. Gary, (29203) (jgary@mbklaw.net)
MUDD, BRUCHHAUS & KEATING, L.L.C.
422 E. College St., Ste. B
Lake Charles, LA 70605
Telephone: (337) 562-2327
Fax: (337) 562-2391

*By Attorneys for Intervenor Plaintiff-Appellee, the State of Louisiana, through the Department of Natural Resources, Office of Coastal Management and its Secretary, Thomas F. Harris:*

*/s/ Donald W. Price*
J. Blake Canfield, (30426) (blake.canfield@la.gov)
Executive Counsel
Donald W. Price, (19452) (donald.price@la.gov)
Special Counsel
LOUISIANA DEPARTMENT OF
NATURAL RESOURCES
Post Office Box 94396
Baton Rouge, LA 70804
Telephone: (225) 342-4274

*By Attorneys for Intervenor Plaintiff-Appellee,*
*the State of Louisiana, Ex Rel. Liz Murrill, Attorney General*

*/s/ David A. Peterson*
David A. Peterson, (22591) (petersond@ag.louisiana.gov)
Interim Chief, Lands & Natural Resources Section
LOUISIANA DEPARTMENT OF JUSTICE
1185 North 3rd Street
Baton Rouge, LA 70802
Telephone: (225) 326-6000
Cell: (225) 312-1913
Fax: (225) 326-6099

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of July, 2024, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system which will send a notice of electronic filing to all attorneys of record.

*/s/ Victor L. Marcello* (9252)

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that the foregoing document complies with Fed. R. App. P. 32(b)(2(A) because it contains 3,881 words. This document also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Word Perfect 2021 in 14-point Times New Roman.

*/s/ Victor L. Marcello* (9252)